622 F.2d 1116
 22 Fair Empl.Prac.Cas. 638,
22 Empl. Prac. Dec. P 30,803
John SIKORA, Otto Kalmbach, Frederick Meyer, Vladimir
Honeiser, Appellants,
v.
AMERICAN CAN COMPANY, a corporation organized and existing
under the laws of the State of New Jersey and
authorized to do business in New Jersey.
 No. 79-1299.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 12, 1979.
Decided March 31, 1980.
 
 John J. Rizzo, Stryker, Tams & Dill, Newark, N. J., for appellee; Simpson, Thacher & Bartlett, John W. Ohlweiler (argued), Ernest J. Collazo, Cecelia T. Roudiez, New York City, of counsel.
 Frank P. Beninato, Jr. (argued), Beninato, Diorio & Grimaldi, Elizabeth, N. J., for appellants.
 Robert E. Williams, Douglas S. McDowell, Monte B. Lake, McGuiness & Williams, Washington, D. C., for amicus curiae (Equal Employment Advisory Council).
 Carin Ann Clauss, Sol. of Labor, Donald S. Shire, Associate Sol., Lois G. Williams (argued), Joseph M. Woodward, U. S. Dept. of Labor, Washington, D. C., for amicus curiae (Secretary of Labor).
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 Plaintiffs filed suit in the district court asserting that their involuntary retirements in 1975 and 1976 before they reached the age of 65 violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (1976)(ADEA). The court entered summary judgment for the defendant on that count but ordered a trial on other allegations of discrimination. In 1978, after entry of the summary judgment, Congress revised the ADEA to prohibit forced retirement under age 70 in most situations. Plaintiffs contend on appeal that the amendments control our disposition of this case. We conclude that the amendments do not apply to a retirement that occurred before the effective date of the enactment, but remand for a determination of whether the defendant's pension plan was bona fide and not a subterfuge.
 
 
 2
 Plaintiffs Honeiser and Kalmbach were employees of defendant American Can Company until they were involuntarily retired. Honeiser began working for the company on March 16, 1964, and on September 1 of that year he voluntarily joined the company retirement plan for salaried employees. He was 56 years old on January 1, 1976, the date of his retirement, when he became eligible for a pension of $194.92 per month for life. Before retirement he had been earning $1,706.00 per month.
 
 
 3
 Kalmbach began his employment with the defendant on December 3, 1962, joined the plan on July 1, 1963, and was age 61 in September 1975 when he was retired on a monthly pension of $215.91. His salary in September 1975 amounted to $1,511.00 per month.[1]
 
 
 4
 The American Can retirement plan was established on July 1, 1959 and covered, on a voluntary basis, all regularly employed full-time salaried employees except those covered by a collective bargaining agreement. From July 1, 1959 until December 31, 1971, the benefits provided for retirement before the plan's normal age of 65 were computed on the basis of a member's salary and contributions. Employee contributions were eliminated after January 1, 1972 and thereafter early retirement pensions were based on salary and years of service. The plan was amended again on January 1, 1974 to provide a different formula for early retirement benefits. Under this arrangement, unless the employee had reached age 55 and completed 30 years of accredited service, his pension could be reduced by one fourth of 1% for each month by which his early retirement preceded his "normal retirement date" at age 65. Generally the plan allowed for early retirement at any time between ages 55 and 65 at the option of either the company or the employee.
 
 
 5
 Dissatisfied with their involuntary retirement from the company, the plaintiffs first exhausted administrative remedies and then filed suit on December 21, 1976, alleging that they had been forced into retirement in violation of the ADEA. They sought reinstatement as well as damages. Plaintiffs later amended the complaint to assert that they were also denied merit and other salary increases because of age. The defendant moved for summary judgment on the ground that the plaintiffs had been retired pursuant to a bona fide pension plan and were not, therefore, covered by the ADEA. 29 U.S.C. § 623(f)(2) (1976).[2] The parties agreed upon the material facts, although the plaintiff contended that the plan was a subterfuge and was not bona fide.
 
 
 6
 The district judge distinguished United Air Lines, Inc. v. McMann, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), which upheld certain forced retirements under the 1967 Act, on the ground that they were mandated by a bona fide plan. But he found Zinger v. Blanchette, 549 F.2d 901 (3d Cir. 1977), cert. denied, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), which allowed retirements on an adequate pension under a discretionary plan, controlling. Thus he granted summary judgment on the retirement claims but left open the claims of discrimination in deprivation of merit raises. Without discussion or findings of fact, the court concluded that the plan was bona fide. Judgment was entered on March 20, 1978.
 
 
 7
 A few weeks later, on April 6, 1978, the same day that plaintiffs took this appeal,[3] Congress revised the ADEA to specifically prohibit involuntary retirement because of age, the amendments to be effective upon enactment.[4] On appeal, plaintiffs contend that the 1978 amendments should apply to this case even though the retirements at issue took place before the effective date of the legislation. In this contention, the plaintiffs are joined by the Secretary of Labor, who has filed an amicus brief.
 
 
 8
 The retroactivity of legislation has been a frequent subject of litigation in the statutory construction field, not only in common law countries but in other civilizations as well. In his frequently cited article, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775 (1936), E. E. Smead observed that the "bias against retroactive laws is an ancient one" and reviewed classical Greek and Roman examples. Id. at 775. The broad generalization, however, has been extensively narrowed over time and may no longer be relied upon in all circumstances. For example, modifications in procedural law are generally given effect in cases where the subject matter is restricted to events that occurred before the statutory enactment. Grummitt v. Sturgeon Bay Winter Sports Club, 354 F.2d 564 (7th Cir. 1965). In some instances, legislation that affected the substantive rights of parties to a prior transaction has been enforced. See Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). See generally Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692 (1960).
 
 
 9
 The immediate application of substantive legislation to pending cases is a form of retroactivity that at times has been invoked by the courts. Chief Justice Marshall, in United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), wrote that generally if, while an appeal is pending, the governing rule is changed by an intervening law, then the latter must be applied. The Chief Justice, however, was concerned there with a case involving the national interest and not merely with substantive rights previously, as here, established by private parties. In Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Court noted that the reasoning of Schooner Peggy applies "where the change (is) constitutional, statutory, or judicial." Id. at 715, 94 S.Ct. at 2018. The rule of Schooner Peggy is further subject, however, to exception when application of the modification would result in manifest injustice, or there is statutory direction or legislative history to the contrary. Id. at 711, 94 S.Ct. at 2016.
 
 
 10
 We turn to the statute under consideration and find its language equivocal. Congress simply provided that the amendment prohibiting involuntary retirement before age 65 "shall take effect on the date of enactment of this Act (April 6, 1978)." This wording is inconclusive. It could mean, as defendant urges, that no such retirements could take place after April 6, 1978. On the other hand, plaintiffs argue that the amendment erased conflicting provisions from existing retirement plans and eliminated defenses based on contractual language. Because both interpretations of the statutory language are plausible, we examine the legislative history.
 
 
 11
 Congressional efforts to revise § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2) (1976), began in 1977 after the Court of Appeals for the Fifth Circuit in Brennan v. Taft Broadcasting Co., 500 F.2d 212 (5th Cir. 1974), and this court in Zinger v. Blanchette, supra, concluded that the Act permitted involuntary retirements before age 65 under a bona fide employee benefit plan. Legislation was introduced in both the House and Senate to amend § 4(f)(2) by providing that employee benefit plans that permitted or required forced, early retirement solely because of age would not be exempt from the Act's coverage. In addition, the bills proposed raising the upper age limit of the Act incrementally to 70, as in S. 1784,[5] or without limit, as in S. 1583.[6] As amended and reported from the House Committee on Education and Labor, a third bill, H.R. 5383,[7] extended coverage to age 70 after a waiting period of six months.
 
 
 12
 A study of the House and Senate floor debate reveals only one clear reference to the question of retroactivity. On October 19, 1977, the Senate passed an amended version of H.R. 5383. Most of the floor discussion centered on the exemption of certain occupations from a prohibition against involuntary retirement between ages 65 and 70. At the close of the debate, however, and after the Senate had voted to approve the measure, Senator Jennings Randolph posed the following question:
 
 
 13
 "Mr. Randolph: I should like to ask the Senator from New Jersey (Mr. Williams) whether this bill retroactively covers a forced retirement at, say, age 60 or 62 prior to the effective date of this bill where the individual so retired is eligible for, and actually receives, a pension under a pension plan which has been qualified with the Internal Revenue Service?
 
 
 14
 Mr. Williams: The bill is not retroactive. The question of mandatory retirements prior to the effective date of this bill will be determined by the courts' interpretation of existing law."
 
 
 15
 123 Cong.Rec. S 17304 (daily ed. Oct. 19, 1977).[8] The bill then went to a conference committee whose members included both Senators Williams and Randolph. But in the interim, the Supreme Court reversed the court of appeals' decision in McMann v. United Air Lines, Inc., 542 F.2d 217 (4th Cir. 1976), and agreed with the conclusions in Brennan v. Taft Broadcasting Co., supra, and Zinger v. Blanchette, supra, that § 4(f)(2) as originally enacted did not ban pension plan provisions calling for involuntary retirement before age 65. Nevertheless, the conference committee did not change the effective date of the amended § 4(f)(2) to have it apply to former employees who had been retired before they reached the age of 65.
 
 
 16
 Recognizing, however, that many existing collective bargaining agreements permitted retirement of persons over 65 and under 70 at the option of the employer, the conference committee adopted a Senate provision delaying the impact of the amended § 4(f)(2) on those plans until the expiration date of the agreement or January 1, 1980, whichever occurred first. The net effect, therefore, was to delay the implementation of the substantive amendments except the one pertaining to forced retirements before age 65, which took effect upon enactment.
 
 
 17
 Further congressional commentary, after the Supreme Court's reversal in McMann, provides indirect support for the view that the amendment was not intended to apply retrospectively. During the Senate debate on the conference report, in commenting on the amendment to § 4(f)(2), Senator Williams, the floor manager, stated:
 
 
 18
 "The conference agreement also clarifies existing law to insure that pension plans or seniority systems which require mandatory retirement may no longer be applied to employees covered by the act."
 
 
 19
 124 Cong.Rec. S 4449 (daily ed. March 23, 1978) (emphasis supplied). On the House floor, Representative Hawkins, the floor manager, noted that the Supreme Court's interpretation of the 1967 Act in McMann allowed retirement under that plan and said, "By virtue of this amendment (to § 4(f)(2)), such a plan no longer falls within the § 4(f)(2) exception." 124 Cong.Rec.H 2270 (daily ed. March 21, 1978) (emphasis supplied). These remarks, though not as explicit as the earlier discussion between Senators Williams and Randolph, are nevertheless consistent with it. To the extent that it is relevant, therefore, the legislative history tends to support the conclusion that Congress did not intend that the amendment retroactively benefit those who had been retired before the effective date of the legislation.
 
 
 20
 The repeated references in the legislative history to Congress's intent to "clarify" the meaning of § 4(f)(2) do not justify an inference that the amendment was to be retroactive. Nor does the fact that Congress specifically disagreed with the Supreme Court's interpretation of § 4(f)(2) in McMann necessitate the conclusion that Congress meant to legislate retrospectively. As we held in United States v. Richardson, 512 F.2d 105 (3d Cir. 1975), references in the legislative history demonstrating a congressional desire to overcome a specific Supreme Court decision do not determine whether Congress also intended to affect events that had occurred before the enactment date.
 
 
 21
 The district courts confronted with the issue of the applicability of the amendments to § 4(f)(2) have with but one exception concluded that it should be read prospectively. Marshall v. Delaware River & Bay Authority, 471 F.Supp. 886 (D.Del.1979); Marshall v. Atlantic Container Line, 470 F.Supp. 71 (S.D.N.Y.1978); Marshall v. Baltimore & Ohio Railroad Co., 461 F.Supp. 362 (D.Md.1978), appeal docketed, Nos. 79-1210-1211 (4th Cir. March 29, 1979); Aldendifer v. Continental Air Lines, 18 Empl.Prac.Dec. P 8874 (C.D.Cal.1978), appeal docketed, No. 79-3104 (9th Cir. Jan. 25, 1979). Contra, Davis v. Boy Scouts, 457 F.Supp. 665 (D.N.J.1978); cf. Marshall v. American Motors Corp., 475 F.Supp. 875, (E.D.Mich.1979) (citing Davis v. Boy Scouts, supra, with approval but not reaching the issue of application to pending cases). Thus, the statutory language is not determinative and the brief legislative history seems to indicate that Congress intended a prospective application.
 
 
 22
 We must also consider the final exception to the Bradley presumption of retroactivity, classified broadly as one where applying the statute "would result in manifest injustice." 416 U.S. at 711, 94 S.Ct. at 2016. As the Court stated, "(N)either our decision in Thorpe (v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)) nor our decision today purports to hold that courts must always thus apply new laws to pending cases in the absence of clear legislative direction to the contrary . . . ." 416 U.S. at 715, 94 S.Ct. at 2018. Although the precise category of cases to which the "manifest injustice" exception applies has not been clearly defined, the Bradley opinion commented that "the Court in Schooner Peggy suggested that such injustice could result 'in mere private cases between individuals,' and implored the courts to 'struggle hard against a construction which will, by a retrospective operation, affect the rights of parties.' " Id. at 717, 94 S.Ct. at 2019, quoting United States v. The Schooner Peggy, supra at 110.[9] In this context, the Bradley Court suggested analysis of "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." Id. at 717, 94 S.Ct. at 2019.
 
 
 23
 In Bradley, the defendant was a school board, a public body supported by taxation, and the plaintiffs were individuals aggrieved by unconstitutional actions of that body. In contrast, the matter at bar is a private case between nonpublic entities. The plaintiffs seek reinstatement and damages for what they assert were premature retirements. Moreover, unlike the situation in Schooner Peggy, which involved national treaty interpretation, resolution of this case would not cause repercussions in the international community, nor would it implicate long standing constitutional violations as in Bradley. Indeed, that Court pointed out that "school desegregation litigation is of a kind different from 'mere private cases between individuals.' " Id. at 718, 94 S.Ct. at 2019.[10]
 
 
 24
 We must also consider the nature of the parties' substantive rights and the impact that application of the 1978 amendment would have on those contractual rights and obligations. Both plaintiffs voluntarily elected to join defendant's retirement plan, thus forming a contract that was prima facie in compliance with the law when the retirements occurred. For at that time, an interpretive bulletin, 29 C.F.R. § 860.110 (1979), issued by the Secretary of Labor in 1969 was in effect and stated: "Thus, the act authorizes involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of § 4(f) (2)." In January 1975, the then Secretary of Labor, without changing the interpretive bulletin, took the position that retirements before 65 were not permissible unless they were required by the terms of the plan and were essential to the plan's economic survival or to some other legitimate purpose.[11] That position, however, has not survived judicial scrutiny as evidenced by the decisions in Taft Broadcasting and Zinger.
 
 
 25
 Indeed, the Taft Broadcasting decision, filed in 1974, was the only appellate decision that had been handed down at the time the plaintiffs were retired. Thus, at that time the defendant had an interpretive ruling of the Secretary of Labor and a court of appeals' opinion sustaining the position that the ADEA permitted involuntary retirement before age 65.[12] Plaintiffs at that juncture therefore had no firmly established right to continue in employment until they reached the age of 65. On the other hand, much as we sympathize with plaintiffs' position, the defendant had the contractual option to retire its employees as permitted by the plan. To that extent, the rights and obligations of the company and of the plaintiffs as well had been fixed and in place in 1975 and 1976 when they retired. In such circumstances, post-Bradley cases have declined to apply new law to pending cases. See National Consumer Information Center v. Gallegos, 549 F.2d 822, 826-27 (D.C.Cir.1977). See also Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944); Hospital Employees Labor Program v. Ridgeway, 570 F.2d 167 (7th Cir. 1978); Weise v. Syracuse University, 522 F.2d 397 (2d Cir. 1975).
 
 
 26
 Nor can we overlook the fact that rulings that may conceivably upset the solvency of pension plans have been given special consideration by the Supreme Court. In Los Angeles Department of Water & Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Court concluded that it was improper to award retroactive relief in a Title VII case where sex differentiated employee contributions to a pension fund were found to be impermissible. Noting that "(d)rastic changes in the legal rules governing pension and insurance funds" can jeopardize their solvency the Court said, "Consequently, the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result." Id. at 721, 98 S.Ct. at 1382.[13] Although this statement appears in a different context than that present here, nevertheless it appears particularly pertinent in view of the Bradley admonition to consider the nature of the rights being litigated and the nature of the impact of the change in law upon those rights.
 
 
 27
 The presumption in favor of retroactivity articulated in Bradley, therefore, is inapplicable to the case sub judice because of the positive legislative history and the "need to prevent manifest injustice." Accordingly, we conclude that the 1978 amendments must not be applied to retirements that occurred before the effective date of the legislation.
 
 
 28
 Plaintiffs also contend that our decision in Zinger v. Blanchette, supra, misinterpreted the ADEA and we should now adopt the position taken by Congress in enacting the amendments. The Supreme Court, however, confronted the same argument in McMann and rejected it, saying, "Legislative observations 10 years after passage of the Act are in no sense part of the legislative history." 434 U.S. at 200 n. 7, 98 S.Ct. at 449. Moreover, even if we were inclined to do so, this panel is not free to reconsider Zinger. United States Court of Appeals for the Third Circuit Internal Operating Procedure VIII-C.
 
 
 29
 In the district court, plaintiffs alleged that the American Can retirement plan was both a subterfuge and not bona fide. Although they did not brief the matter on appeal, we do have the benefit of the research on the point in the Secretary's brief. Since this case must be returned to the district court in any event, we consider the issue for the guidance of the district court. It is argued that the plan is not bona fide within the meaning of Rogers v. Exxon Research & Engineering Co., 550 F.2d 834, 838 (3d Cir. 1977), cert. denied, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978), and Zinger v. Blanchette, supra at 905, 909 & n.20; accord, Marshall v. Hawaiian Telephone Co., 575 F.2d 763, 766 (9th Cir. 1978), because the earliest age at which retirement is permitted is too low and the pensions are inadequate. The district court said that the plan was bona fide but the record does not reveal the factual basis for that conclusion, which has been disputed by the plaintiffs. Therefore, we are not in a position to pass upon plaintiffs' contentions that the age limit for early retirement is too low and the pensions are inadequate.
 
 
 30
 Moreover, the contention that the plan was a subterfuge cannot be resolved on this record. The Supreme Court held in McMann that a plan established before passage of the Act in 1967 was not a subterfuge. Alterations made to a plan after ADEA was in effect, however, may be examined to see if the changes were designed to evade the purposes of the Act. A copy of the 1974 plan is part of the record but whether that includes significant changes from the 1959 plan is not apparent to us. Since the case must be returned to the district court for a resolution of the claims of discrimination in denying raises, the court on remand should also permit the plaintiffs to develop their contentions that the plan is not bona fide and is, in fact, a subterfuge.
 
 
 31
 The judgment of the district court will be vacated and remanded for further proceedings consistent with this opinion. The parties shall bear their own costs.
 
 
 32
 ADAMS, Circuit Judge, dissenting.
 
 
 33
 Four employees of American Can Company, alleging that they were involuntarily retired in violation of the Age Discrimination in Employment Act of 1967,[1] brought this action for damages and reinstatement to their previous positions.[2] The company's retirement plan, established in 1959 and twice subsequently amended, permitted early retirement of employees between ages 55 and 65 at the option of either the employer or the employee. At the time the appellants, Vladimir Honeiser and Otto Kalmbach,[3] were retired in 1975 and 1976 respectively, the Act provided that it was not unlawful for an employer to retire an employee pursuant to the terms of a bona fide retirement or pension plan.[4] The plaintiffs alleged that the American Can retirement and pension plan was not bona fide and was in fact a subterfuge to evade the purposes of the Act. The district court rejected these contentions and on March 20, 1978 granted the company's motion for summary judgment.[5] Appellants filed their notice of appeal on April 6. On the same day, a statute amending the 1967 Act took effect. One of the amendments forbade the involuntary retirement of any person covered by the Act.[6] Appellants argue here that the 1978 amendments control this appeal.
 
 
 34
 After carefully reviewing both the statutory language and the legislative history of the amendments, the majority states that it is unable to ascertain with certainty whether the Congress intended that the amendment apply prospectively to forbid only those involuntary retirements that postdate its enactment. The majority concludes, however, that it would be "manifestly unjust" to apply the amendment to the retirements at issue here, and therefore declines to do so. I agree that the language and history of the amendment are ambiguous and thus do not provide a sufficiently clear indication of congressional intent to guide today's decision. In my view, however, it would not be "manifestly unjust" the apparent hallmark of the Supreme Court's retroactivity analysis to accord appellants the protections of the 1978 amendment. Accordingly, for the reasons set forth more fully below, I respectfully dissent.
 
 I.
 
 35
 The question of retroactivity has perplexed courts for centuries. Justice Holmes once remarked that "perhaps the reasoning of the cases has not always been as sound as the instinct which directed the decisions," and suggested that the crux of most judgments regarding retroactivity has been "the prevailing views of justice."[7] As the majority aptly observes, historically there was a "bias against retroactive laws (which) is an ancient one," dating back at least to the Greek city states.[8] In the United States, the Supreme Court early established that, absent clear expression to the contrary, a statute is presumed to have prospective effect only.[9] During the nineteenth century, this presumption was so entrenched that, in his Commentaries, Chancellor Kent was able to declare that "(a) retroactive statute . . . would be against every sound principle."[10] After the turn of the century, in deciding that a federal statute granting a railroad right-of-way was not retroactive, the Supreme Court declared that
 
 
 36
 the first rule of construction is that legislation must be considered as addressed to the future, not to the past. The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed. The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights or by which human action is regulated, unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."[11]
 
 
 37
 For the next half-century, the Court continued to adhere to the presumption of nonretroactivity.[12] In Greene v. United States[13] for example, an aeronautical engineer, whose Department of Navy security clearance was revoked and later ordered reinstated by the Supreme Court,[14] sought monetary restitution pursuant to a 1955 Department of Defense regulation. The government conceded that under the 1955 regulation the petitioner was entitled to relief, but argued that the Court should apply a 1960 regulation issued while the claim was being processed. Reaffirming that the first rule of statutory construction is a presumption of prospectivity, the Court held the 1960 regulation inapplicable.[15] It emphasized that the petitioner's rights were asserted under the 1955 directive and had matured as a result of its earlier ruling.[16]
 
 
 38
 Thus, until the mid-1960's, the concept of presumed prospectivity appeared to be a well-settled principle of American jurisprudence. Yet, throughout its history the Supreme Court maintained a parallel, but seemingly contradictory, rule that if the relevant law is changed during the pendency of an appeal the reviewing court ordinarily is bound to apply the new law. The genesis of this rule was Chief Justice Marshall's opinion for the Court in United States v. Schooner Peggy.[17] The United States Navy captured the Peggy, a French schooner in April 1800. After the case was taken to the Supreme Court by writ of error, Congress ratified a treaty with France which provided that "(p) roperty captured, and not yet definitively condemned, or which may be captured before the exchange of ratifications . . . shall be mutually restored."[18] In holding that the treaty required that the circuit court's condemnation order be reversed, the Court declared:
 
 
 39
 It is, in the general, true, that the province of an appellate court is only to inquire whether a judgment, when rendered, was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs the law must be obeyed, or its obligation denied.[19]
 
 
 40
 The Court limited its retroactivity holding in Schooner Peggy, however, to cases implicating great national concerns, acknowledging that "in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties."[20]
 
 
 41
 Since Schooner Peggy, the Court on a number of occasions has given effect to a change in a law that occurred after the trial court's judgment but before the case was finally resolved on appeal.[21] Although each case concerned retrospective application of newly announced law, in none did the Court attempt to rationalize its decision with the so-called "first rule" of statutory interpretation presumptive nonretroactivity.
 
 
 42
 In two cases arising during the last eleven years, however, the Court confronted the task of reconciling the two seemingly contradictory approaches to retroactivity. For cases pending or not yet filed at the time the law is changed, the Court appears to have abandoned the presumption of prospectivity, adopted instead a rule of presumed retroactivity, and incorporated the prospectivity presumption into a "manifest injustice" exception to the new rule.
 
 
 43
 In Thorpe v. Housing Authority,[22] a tenant in a federally assisted housing project was evicted following fifteen days notice as authorized by the lease agreement. After the Supreme Court granted certiorari, the Department of Housing and Urban Development promulgated a circular that required local housing authorities to give tenants the reasons for eviction and to afford them an opportunity for explanation or reply. The Court held that the tenant should receive the protections of the HUD circular and announced the "general rule" that "an appellate court must apply the law in effect at the time it renders its decision."[23] Quoting from Schooner Peggy,[24] the Court stressed that this rule applies to all changes in law, whether constitutional, statutory, judicial, or administrative.[25] Most importantly, the Court distinguished and limited Greene the last case explicitly following the previous general rule of presumed prospectivity[26] as an exception to the new general rule, made to prevent "manifest injustice."[27]
 
 
 44
 Five years later, the Court confirmed the principles announced in Thorpe. In Bradley v. School Board,[28] the district court had awarded attorneys' fees to the plaintiffs, who had prevailed in their suit to desegregate the Richmond, Virginia school system.[29] After the case was appealed, but before the court of appeals rendered its decision, Congress enacted legislation that authorized the federal courts to award reasonable attorneys' fees. The court of appeals, believing that the legislation could not be given retroactive effect unless such were the clear intent of the Congress,[30] reversed the district court's attorneys' fees award.[31] The Supreme Court in turn reversed the court of appeals.
 
 
 45
 At the outset, the Court noted that its holding was limited to cases pending direct review at the time the change in law took effect.[32] Relying on Schooner Peggy, the Court grounded its holding "on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."[33] The Court noted that following Schooner Peggy it was unclear whether this rule applied only where the statute at issue specifically provided that it be applied to cases pending at the time of enactment, or whether the rule was of general applicability. It conceded that its decisions prior to Thorpe "did little to clarify (the) issue,"[34] but read that opinion as setting forth a general presumption that "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect."[35]
 
 
 46
 Thorpe and Bradley thus represent a dramatic shift in the law of retroactivity. In cases pending at the time the law is changed, or filed thereafter, courts are now bound to apply the new law unless (1) there is a clear legislative directive to the contrary; or (2) to do so would cause manifest injustice to the party adversely affected by the change in law. Several courts have declined to follow Thorpe and Bradley in cases where the change in law created a new cause of action or affected the substantive rights of the parties.[36] Although it is possible to distinguish Thorpe and Bradley on this ground, such an approach would appear to be at variance with the broad and clear language of the opinions. Not only did the Court promulgate a "general rule" applicable to all forms of changes in law, it also specifically limited the presumptive prospectivity cases to the manifest injustice exception.[37] Moreover, the Court's broad endorsement in Thorpe and Bradley of the Schooner Peggy method of analysis would appear to reaffirm its earlier holding in United States v. Alabama.[38] There the United States brought suit against, inter alia, the State of Alabama, alleging that the defendants were denying black citizens the right to vote in violation of the Fifteenth Amendment and Title IV of the Civil Rights Act of 1957.[39] The district court dismissed the claim on the ground that the Act did not authorize such a suit against a state. While the case was pending in the Supreme Court, an amendment to the Civil Rights Act creating a cause of action against the states for racial discrimination in voting was enacted into law. The Court held that the amendment was applicable to the case and remanded the case to the district court for trial.[40] In sum, both prior case law and the language of Thorpe and Bradley support their applicability to cases such as the present one in which the change in law creates a new substantive cause of action.
 
 
 47
 Thus, absent clear congressional direction to the contrary or a determination that manifest injustice would result, the Age Discrimination in Employment Act Amendments of 1978, which prohibit involuntary retirement before age 70, control our resolution of this appeal.
 
 II.
 
 48
 After scrutinizing the 1978 amendment to § 623(f)(2), the majority concludes that "the statutory language is not determinative and the brief legislative history seems to indicate that Congress intended a prospective application."[41] As the majority correctly notes, however, this falls short of a "clear legislative direction" that the law have only prospective effect the test required by Thorpe and Bradley. Although the question is a close one, I agree that Congress has not clearly exhibited an intention to limit the amendment to prospective applicability sufficient to overcome the opposite presumption that the Supreme Court has established. Accordingly, like the majority, I must turn to the equally difficult question whether it would be manifestly unjust to apply the 1978 amendment to the present appeal.
 
 
 49
 In ascertaining in Bradley whether it would be manifestly unjust to apply the new law authorizing the award of attorneys' fees to successful civil rights litigants, the Court pointed to three factors for consideration: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights."[42] It then concluded that none of the three factors supported a finding of manifest injustice in that case. First, the fact that the defendant was a public agency and the plaintiffs were a class of children who had enhanced community welfare by forcing the school board to comply with the dictates of the Constitution supported an award of attorneys' fees to the plaintiffs.[43] The Court also stressed that the private enforcement of civil rights is a matter of "great national concern" which would be furthered by awarding attorneys' fees to successful plaintiffs.[44] Second, the Court held that Bradley was not a case in which application of the intervening change in law would deprive the defendant of "a right that had matured or become unconditional."[45] "It cannot be claimed," stated the Court, "that the publicly elected School Board had such a right in the funds allocated to it by the taxpayers."[46] Third, the Court was of the view that application of the new law would not impose "an additional or unforeseeable obligation" on the defendant because there was no indication that the school board would have acted differently had it known it could be subject to statutory, rather than merely common law, liability for attorneys' fees.[47]
 
 
 50
 Relying on this analysis, the majority concludes that it would be manifestly unjust in this appeal to apply the 1978 amendment to § 623(f)(2). The majority observes first that the party bearing the cost of retrospective application of the new law was a public agency in Bradley and a private corporation in the present case. Presumably the majority infers from this that it is unfair to burden a corporation with such costs but not to so burden the public that funded the school board in Bradley. This conclusion is reached without the aid of empirical data regarding relative costs. But it is not intuitively clear, at least to me, why the fact that American Can is a private corporation should be of controlling importance to the determination of manifest injustice.
 
 
 51
 In Bradley, the Supreme Court asserted that "school desegregation litigation is of a kind different from 'mere private cases between individuals.' "[48] One means of interpreting this statement would be to hold the rule of presumptive retroactivity inapplicable to cases between private litigants. Indeed, in both Thorpe and Bradley the party bearing the cost of the retrospective application of the new law was a government agency. Such a limitation would be inconsistent, as I see it, however, with the broad language of the two opinions. In Thorpe, the Court announced a "general rule," and in Bradley it was careful to distinguish and limit all prior cases which had suggested that presumed nonretroactivity was the general rule.[49] To limit Thorpe and Bradley in this manner therefore not only would appear to be contrary to the language of the opinions, but also would invert what the Court has defined as a general rule into a limited rule applicable only to a relatively small number of public law cases.
 
 
 52
 The real significance then of the Court's differentiation between cases touching on school desegregation and "mere private cases" would appear to be in its description of the former as matters of "great national concern."[50] Thus, the critical question becomes whether this otherwise private litigation involves issues of great national concern such that application of existing law would further an important, congressionally expressed federal policy.
 
 
 53
 Implicit in the majority's opinion is the notion that Congress did not view involuntary retirement of older workers as a great national concern. My reading of the legislative history, however, convinces me that Congress did regard the 1978 amendments as matters of profound national importance.
 
 
 54
 Illustrative is the Senate Report.[51] The Committee on Human Resources stated that "as a matter of basic civil rights people should be treated in employment on the basis of their individual ability to perform a job rather than on the basis of stereotypes about race, sex, or age."[52] The report also stressed that "(r)ecent studies have demonstrated the important relationship between activity and good health," and noted that the problem of job discrimination in the mandatory retirement of the elderly was of nationwide concern.[53] "Society as a whole," the report emphasized, "suffers from mandatory retirement."[54] Thus, the Age Discrimination in Employment Act Amendments of 1978 apparently were designed to remedy what the Senate committee believed was a problem of serious national concern. Indeed, the Senate committee characterized age discrimination in employment as a problem on a par with racial and sexual discrimination matters of concededly great national importance. Moreover, the House version of the amendments although accompanied by a less detailed legislative history than the Senate bill was stronger than the Senate's version.[55]
 
 
 55
 Ensuring the continued employment of older persons the heart of the 1978 amendments is, in my view, of comparable national importance as were the specific interests that were actually promoted by the application of new law in Thorpe and Bradley. Although the cases involved housing and school desegregation respectively, the actual interests that the Court held to be matters of "great national concern" were much narrower. In Thorpe, the 1960 HUD circular merely provided tenants of federally assisted housing projects with the right to obtain the reasons for and a right of reply to an eviction order; it did not guarantee them continued housing. Similarly, retroactive allowance of attorneys' fees in Bradley, although rewarding the plaintiffs for their efforts, did not directly affect the prospects of remedying the problem that was of true national concern: segregation in the public schools. In contrast, the 1978 amendment to the Age Discrimination in Employment Act was addressed particularly to the problem that the Senate characterized as akin to racial and sexual discrimination that is, the involuntary retirement of older workers.
 
 
 56
 Under the circumstances, I cannot agree with the majority that this case is a mere private dispute between individuals. Age discrimination in employment has been classified by the Congress as a matter of "great national concern," at least as the Supreme Court has used that phrase in Thorpe and Bradley. Accordingly, I would hold that the first element of the Bradley manifest injustice test is not a bar to the application of the 1978 amendments to this appeal.
 
 
 57
 The majority also reads the second element of the manifest injustice exception as militating against retrospective application of the 1978 amendments to § 623(f)(2). At the time the appellants were involuntarily retired, the majority observes, the parties' rights and obligations "had been fixed and were mature" because both a court of appeals decision and an interpretive bulletin of the Secretary of Labor ascribed to the view that it was lawful to retire involuntarily persons in the appellants' positions.[56]
 
 
 58
 In my view, the two rulings relied on by the majority did not cause the parties' rights and obligations to mature or become unconditional as, for example, was the situation in Greene.[57] The decision to which the majority refers is Brennan v. Taft Broadcasting Co.,[58] handed down by the Court of Appeals for the Fifth Circuit in 1974. In deciding to retire the appellants in 1975 and 1976, American Can may well have referred to Taft Broadcasting. After all, that opinion was the only discussion by a court of appeals on the question whether the 1967 Act prohibited involuntary retirement before age 65. Inasmuch as the retirements at issue in the present case took place within this circuit, however, I do not believe that American Can's "right" to retire the appellants can be said to have "matured or become unconditional" by reason of a decision of a sister court of appeals.[59] Unlike Greene, in which the petitioner's rights had unconditionally matured as a result of a prior ruling by the Supreme Court,[60] the Fifth Circuit's decision neither directly affected American Can nor established law that would be binding on the company. Only a final decision by the Supreme Court, this Court, or the District Court for the District of New Jersey could definitively and unconditionally establish, within the Bradley formulation, American Can's rights and obligations under the 1967 Act, at least in regard to the operations of its New Jersey plant. Consequently, I cannot agree with the majority that the Fifth Circuit's ruling in Taft Broadcasting stands as a bar to our applying the 1978 amendments to this appeal.
 
 
 59
 Somewhat more troublesome is the majority's argument that, by virtue of section 7(e) of the 1967 Act,[61] American Can's rights became unconditional as a result of a 1969 interpretive bulletin of the Secretary of Labor.[62] Section 7(e) incorporates the good faith defense of the Portal-to-Portal Act that "no employer shall be subject to any liability . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any . . . interpretation, of the agency."[63] Had American Can pleaded such reliance as an affirmative defense as required by the Act, the interpretive bulletin, if in fact relied on by the company, might well bar application of the 1978 amendment to this case. But, the company did not so plead, and, because this matter is before us on an appeal from the grant of a summary judgment, the company cannot be said to have proved reliance. Therefore, I am unable to conclude, as the majority does, that section 7(e) brings this case within the second manifest injustice exception to Thorpe and Bradley.
 
 
 60
 Part three of the Bradley manifest injustice exception derives from the concern that "new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard."[64] In Bradley, the Court held that no unanticipated obligations were imposed on the school board because, prior to the enactment of the statute authorizing the federal courts to award attorneys' fees, there existed some common law support for the awarding of such fees in school desegregation cases.[65] The common law authority for granting attorneys' fees in Bradley was far from certain, however. Indeed, it reasonably would appear not to have been applicable to the Bradley litigation. In reversing the district court's award, the Court of Appeals for the Fourth Circuit stressed that judicial authorization of fees was limited to a narrow class of cases. The court relied specifically on an earlier decision arising out of the Richmond school desegregation litigation in which it held that "(a)ttorneys' fees are appropriate only when it is found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinacy".[66] Because it believed that the school board, in formulating a desegregation plan, "was not operating in an area where the practical methods to be used were plainly illuminated or where prior decisions had not left a 'lingering doubt' as to the proper procedure to be followed," the court of appeals held that the board was not unyielding.[67] As a result, the court found no common law authority for the district court's award of attorneys' fees.[68]
 
 
 61
 The Supreme Court agreed that the common law basis for an award of fees was uncertain, but held that the school board had "engaged in a conscious course of conduct with the knowledge that, under different theories, . . . (it) could have been required to pay attorneys' fees."[69] Under these circumstances, the Court concluded, application of the recently enacted statute authorizing the granting of fees "does not impose an additional or unforeseeable obligation upon (the board)."[70]
 
 
 62
 As I see it, the state of the law regarding involuntary retirement at the time appellants' employment was terminated in 1975 and 1976 was much less certain than was the state of common law authority for the granting of attorneys' fees in the school litigation in Bradley. Thus, any change or clarification of the law of age discrimination would be more foreseeable than was the change in the attorneys' fees law in Bradley. In Bradley, there was a clear prior holding by the Court of Appeals for the Fourth Circuit sitting en banc that, absent statutory authorization, "(i)t is only in the extraordinary case that . . . an award of attorneys' fees is requisite," defining such a case as one in which the school board's "unreasonable, obdurate obstinacy" necessitated the litigation.[71] The Supreme Court, on the assumption that the school board had not acted unreasonably, held that the common law of attorneys' fees nevertheless was sufficiently settled that application of the attorneys' fees statute was not unforeseeable.[72] In contrast, in the present case there was no ruling construing the 1967 Act by any court possessing binding lawmaking authority over American Can's operations in New Jersey.[73] Moreover, interpretations of the 1967 Act, made both before and after the appellants' retirement, strongly suggest that the state of the law was reasonably open to varying constructions. Although the Secretary of Labor in 1969 read the 1967 Act as generally permitting involuntary retirements, by 1974 in Taft Broadcasting the Secretary had reversed his position and was advocating the contrary interpretation. In cases following Taft Broadcasting, the Secretary adhered to the latter position.[74]
 
 
 63
 Nor did judicial interpretations of the 1967 Act offer clear guidance. Taft Broadcasting itself was a two-to-one decision, written over a forceful dissent by Judge Tuttle.[75] In subsequent cases, the circuits were divided. For example, we held in Zinger v. Blanchette[76] that the 1967 Act did not generally proscribe involuntary retirement, while the Court of Appeals for the Fourth Circuit, in McMann v. United Air Lines, Inc.,[77] held that it did. Even in the Supreme Court, which reversed the Fourth Circuit's decision in McMann, the Justices were split on the question of statutory interpretation.[78] While it is not suggested that the Supreme Court's interpretation of the 1967 Act was incorrect,[79] I do not believe that, at the time the appellants were retired in 1975 and 1976, the Act was unambiguously clear or the interpretations of the law well-settled. Under these circumstances, it cannot be said that the change in law adopted by Congress in the 1978 amendments to § 623(f)(2) was unforeseeable by American Can. I would hold therefore that application of the amendments to this appeal would not be manifestly unjust to American Can within the meaning of the third Bradley exception.[80]III.
 
 
 64
 Throughout most of its history, the Supreme Court has maintained two seemingly contradictory lines of authority on the question of the effect of a change in law on pending cases. Twice in the last eleven years, however, the Court has attempted to reconcile the two. In Thorpe and Bradley, it announced a general rule that when a change in law takes place while a case is pending, a court is to apply the new law unless there is a clear legislative directive to the contrary or unless such an application would result in manifest injustice to the party burdened by the change of law.
 
 
 65
 As does the majority, I do not believe that either the language of the 1978 amendments to § 623(f)(2) or its legislative history manifests a clear congressional intent that the amendment be given only prospective effect. My reading of the factors set forth by the Supreme Court in Bradley, however, convinces me that it would not be manifestly unjust to American Can to apply the amendments on this appeal. Because the majority concludes otherwise, I respectfully dissent.
 
 
 
 [1]
 A third plaintiff, John Sikora, retired at age 59 on a monthly pension of $767.46, reduced to $564.00 on January 1, 1979 and payable thereafter for life. He had worked for the company since 1930 except for a period of four years. He joined the plan in 1964. At time of retirement, his salary was $1,199.00 per month. Sikora settled his case after this appeal was taken. The claim of Frederick Meyer, the fourth plaintiff was dismissed by stipulation
 
 
 [2]
 As enacted in 1967, 29 U.S.C. § 623 (1976) read in pertinent part:
 "(f) It shall not be unlawful for an employer, employment agency, or labor organization
 (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual."
 
 
 [3]
 The first appeal taken by the plaintiffs was dismissed by this court because of a lack of compliance with Fed.R.Civ.P. 54(b). The district court thereafter entered an appropriate order and consequently we now have jurisdiction to consider this appeal
 
 
 [4]
 As amended in 1978, 29 U.S.C. § 623 (Supp. II 1978) reads in relevant part:
 "(f) It shall not be unlawful for an employer, employment agency, or labor organization
 (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual."
 
 
 [5]
 S. 1784, 95th Cong., 1st Sess., 123 Cong.Rec.S 11108 (daily ed. June 29, 1977)
 
 
 [6]
 S. 1583, 95th Cong., 1st Sess., 123 Cong.Rec. 16101-02 (1977)
 
 
 [7]
 H.R. 5383, 95th Cong., 1st Sess. (1977)
 
 
 [8]
 Both Senators Williams and Randolph were members of the Senate Human Resources Committee, which had brought the bill to the floor. The exchange between the two Senators was obviously intended to create a "legislative history." The reference to the "courts' interpretation of existing law" must be understood in light of the fact that the McMann case had been argued before the Supreme Court two weeks earlier. The congressional committees considering the ADEA amendments had previously expressed their approval of the opinion of the court of appeals in McMann v. United Air Lines, Inc., 542 F.2d 217 (4th Cir. 1976), which held that the ADEA prohibited mandatory retirement based on age before 65. E.g., S.Rep. No. 493, 95th Cong., 1st Sess. 10, reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 504, 513
 
 
 [9]
 Schooner Peggy presented a matter of national policy, a critical distinction from the case at bench. In announcing the rule, Chief Justice Marshall cautioned against an application of statutory construction even as to a pending case when it affects the rights of private parties
 
 
 [10]
 In United States v. Alabama, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960), the Court applied recently enacted legislation to permit suits directly against states for violations of voting rights. The legislative history reflects Congress's knowledge that the statute was intended to apply to the case then pending before the Supreme Court. See 106 Cong.Rec. 7605, 7615 (1960). Moreover, the suit sought enforcement of preexisting rights
 
 
 [11]
 In a report to Congress, Secretary Brennan stated:
 "(R)etirements (before 65) are unlawful unless the mandatory retirement provision: (1) is contained in a bona fide pension or retirement plan, (2) is required by the terms of the plan and is not optional, and (3) is essential to the plan's economic survival or to some other legitimate purpose
 i. e., is not the plan for the sole urpose (sic) of moving out older workers, which purpose has not been made unlawful by the ADEA."
 Dept. of Labor, January 1975 report pertaining to activities in connection with the Age Discrimination in Employment Act of 1967, at 17 (1975).
 
 
 [12]
 Section 7(e) of ADEA, 29 U.S.C. § 626(e) (1976), incorporates the good faith defense set out in the Portal To Portal Act:
 "(N)o employer shall be subject to any liability . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation of the agency." 29 U.S.C. § 259 (1976).
 
 
 [13]
 Turning aside the plaintiffs' contention that the award in that case would not be crippling to the defendants because it was limited to contributions for three years, the Court stated, "(W)e cannot base a ruling on the facts of this case alone." Los Angeles Dept. of Water & Power v. Manhart, supra at 722 n.42, 98 S.Ct. at 1382. Nor can we look only to the number of claims pending against American Can
 
 
 [1]
 29 U.S.C. § 623(a) (1976). This section provides in relevant part:
 It shall be unlawful for an employer
 (1) to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .
 
 
 [2]
 The plaintiffs also claimed that they were unlawfully denied merit raises on account of age. See 29 U.S.C. § 623(a) (1976). The district court has not yet resolved this claim; hence, it is not a subject of this appeal. See note 5 infra
 
 
 [3]
 The third plaintiff, John Sikora, settled his claim against American Can after this appeal was filed. The district court dismissed the claim of the fourth plaintiff, Frederick Meyer, by stipulation
 
 
 [4]
 29 U.S.C. § 623(f) (1976) (amended 1978) provided in relevant part:
 It shall not be unlawful for an employer, employment agency, or labor organization
 (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual . . . .
 
 
 [5]
 American Can did not move for summary judgment on the denial of merit raises claims. See note 2 supra. Because these claims are still pending in the district court, the trial judge has entered final judgment on the retirement claims pursuant to Fed.R.Civ.P. 54(b)
 
 
 [6]
 Age Discrimination in Employment Act Amendments of 1978, Pub.L.No. 95-256, § 2(a), 92 Stat. 189 (amending 29 U.S.C. § 623(f)(2) (1976)). Following the amendment, § 623(f)(2) reads that it shall not be unlawful for an employer
 to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual . . . .
 29 U.S.C. § 623(f)(2) (Supp. II 1978) (emphasis added).
 
 
 [7]
 Danforth v. Groton Water Co., 178 Mass. 472, 476, 59 N.E. 1033, 1034 (1901)
 
 
 [8]
 Majority opinion, supra at 1119 (quoting Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775, 776 (1936))
 
 
 [9]
 See, e. g., United States v. Heth, 7 U.S. 339, 3 Cranch 399, 2 L.Ed. 479 (1806); Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798)
 
 
 [10]
 1 J. Kent, Commentaries on American Law 611-12 (14th ed. J. Gould 1896). See G. Endlich, A Commentary on the Interpretation of Statutes §§ 271-294 (1888)
 
 
 [11]
 Union Pac. R. R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citations omitted)
 
 
 [12]
 See, e. g., Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944)
 
 
 [13]
 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964)
 
 
 [14]
 Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)
 
 
 [15]
 Id. 376 U.S. at 160, 84 S.Ct. at 621 (citing Union Pac. R. R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913))
 
 
 [16]
 Id. at 160-61, 84 S.Ct. at 621-22. See note 14 supra
 
 
 [17]
 5 U.S. 103, 1 Cranch 103 (1801)
 
 
 [18]
 Id. at 107, 1 Cranch at 107
 
 
 [19]
 Id. at 110, 1 Cranch at 110
 
 
 [20]
 Id. at 110, 1 Cranch at 110
 
 
 [21]
 See, e. g., United States v. Alabama, 362 U.S. 602, 604, 80 S.Ct. 924, 926, 4 L.Ed.2d 982 (1960) (per curiam) (applying to case pending on appeal Civil Rights Act of 1960 which created cause of action against state); Ziffrin, Inc. v. United States, 318 U.S. 73, 78, 63 S.Ct. 465, 468, 87 L.Ed. 621 (1943) (applying amendment to Interstate Commerce Act enhancing standards required for granting to single carrier both common carrier and contract carrier status to pending permit application process); Hines v. Davidowitz, 312 U.S. 52, 60-62, 61 S.Ct. 399, 400, 401, 85 L.Ed. 581 (1941) (holding that subsequent congressional statute regulating registration of aliens retroactively preempted state law); Vanderbark v. Owens-Illinois Glass Co., 311 U.S. 538, 541-43, 61 S.Ct. 347, 349, 350, 85 L.Ed. 327 (1941) (federal appellate court must apply state supreme court's interpretation of state law which intervened trial and appellate decisions); Carpenter v. Wabash Ry. Co., 309 U.S. 23, 26-29, 60 S.Ct. 416, 417, 419, 84 L.Ed. 558 (1940) (relying on Schooner Peggy) (amendment to Bankruptcy Act which provided it was to apply to pending cases held applicable on appeal); United States v. Chambers, 291 U.S. 217, 221-26, 54 S.Ct. 434, 435, 436, 78 L.Ed. 763 (1934) (repeal of Eighteenth Amendment by Twenty-first Amendment terminated federal government's authority to prosecute alleged violation of National Prohibition Act that occurred prior to repeal); Missouri ex rel. Wabash Ry. Co. v. Public Serv. Comm'n, 273 U.S. 126, 130-31, 47 S.Ct. 311, 313, 71 L.Ed. 575 (1927) (vacating judgment of state supreme court regarding state law because of intervening legislative change in state law); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 201, 42 S.Ct. 72, 75, 66 L.Ed. 189 (1921) (applying Clayton Act to case pending on appeal at time of statute's enactment); Dinsmore v. Southern Express Co., 183 U.S. 115, 119-21, 22 S.Ct. 45, 46-47, 46 L.Ed. 111 (1901) (relying on Schooner Peggy) (amendment excluding express companies from War Revenue Act of 1898 mandates dismissal of suit brought to enjoin company from using funds to meet Act's requirements)
 
 
 [22]
 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)
 
 
 [23]
 Id. at 281, 89 S.Ct. at 526
 
 
 [24]
 See text at note 19 supra
 
 
 [25]
 393 U.S. at 282, 89 S.Ct. at 526
 
 
 [26]
 See text at notes 13-16 supra
 
 
 [27]
 393 U.S. at 282, 89 S.Ct. at 526
 
 
 [28]
 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)
 
 
 [29]
 Bradley v. School Bd., 53 F.R.D. 28 (E.D.Va.1971), rev'd, 472 F.2d 318 (4th Cir. 1972), rev'd, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973)
 
 
 [30]
 Thompson v. School Bd., 472 F.2d 177, 178 (4th Cir. 1972) (en banc) (per curiam) (companion case), cert. denied, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973)
 
 
 [31]
 472 F.2d 318, 331-32 (4th Cir. 1972) (en banc), rev'd, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973)
 
 
 [32]
 416 U.S. at 710-11, 94 S.Ct. at 2015-16
 Citing Linkletter v. Walker, 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965), the Court distinguished between changes in the criminal law that are presumed to apply to direct criminal appeals but are not necessarily applicable to cases on collateral review pursuant to 28 U.S.C. §§ 2254 or 2255 (1976). Presumably, this reference to Linkletter was intended to limit the Bradley holding to pending cases and to those that might be filed in the future. In other words, the decision would not affect cases in which final judgment had previously been entered. The Court defined final judgment as "one where 'the availability of appeal' has been exhausted or has lapsed, and the time to petition for certiorari has passed." 416 U.S. at 711 n.14, 94 S.Ct. at 2016 (quoting Linkletter, 381 U.S. at 622 n.5, 85 S.Ct. at 1733 n.5).
 
 
 [33]
 Id. at 711, 94 S.Ct. at 2016
 
 
 [34]
 Id. at 713, 94 S.Ct. at 2017 (footnote citing cases omitted)
 
 
 [35]
 Id. at 715, 94 S.Ct. at 2018
 
 
 [36]
 See, e. g., Jones v. City of San Antonio, 568 F.2d 1224, 1225-26 (5th Cir. 1978) (per curiam); Faulkner v. Federation of Preschool and Community Educ. Centers, Inc., 564 F.2d 327, 328 (9th Cir. 1977) (per curiam); Monell v. Department of Soc. Servs., 532 F.2d 259, 261-62 (2d Cir. 1976), rev'd on other grounds, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Cohen v. Illinois Inst. of Technology, 524 F.2d 818, 822 & n.4 (7th Cir. 1975); cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); Weise v. Syracuse Univ., 522 F.2d 397, 410-11 (2d Cir. 1975). Each of these cases involved the question whether the 1972 amendments to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b) (1976), deleting the exemptions for state and local employees, applied retroactively
 
 
 [37]
 See text accompanying notes 22-35 supra
 
 
 [38]
 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960) (per curiam)
 
 
 [39]
 42 U.S.C. § 1971(a) (1976)
 
 
 [40]
 362 U.S. at 604, 80 S.Ct. at 926. Cf: Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 638 n.8, 94 S.Ct. 791, 795 n.8, 39 L.Ed.2d 52 (1974) (stating without explanation that amendment extending requirements of Title VII of Civil Rights Act of 1964 to state agencies and educational institutions is "of course inapplicable to the cases now before us")
 
 
 [41]
 Majority opinion, supra at 1122
 
 
 [42]
 416 U.S. at 717, 94 S.Ct. at 2019
 
 
 [43]
 Id. at 718, 94 S.Ct. at 2019
 
 
 [44]
 Id. at 719, 94 S.Ct. at 2020
 
 
 [45]
 Id. at 720, 94 S.Ct. at 2020 (citing Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); Union Pac. R. R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913), discussed at p. 1118 and n.14 supra)
 
 
 [46]
 Id
 
 
 [47]
 Id. at 720-21, 94 S.Ct. at 2020-21
 
 
 [48]
 416 U.S. at 718, 94 S.Ct. at 2019, quoted in majority opinion, supra at 1122
 
 
 [49]
 See text accompanying notes 22-35 supra
 
 
 [50]
 416 U.S. at 719, 94 S.Ct. at 2020. See text at note 44 supra
 Although consideration of the question whether the case is one of "great national concern" would seem to be inconsistent with the Supreme Court's declaration in Thorpe and Bradley of a "general rule" of presumed retroactivity, this factor appears to have influenced the Bradley Court's resolution of the first component of the manifest injustice exception.
 
 
 [51]
 S.Rep.No.95-493, 95th Cong., 2d Sess., reprinted in (1978) U.S.Code Cong. & Admin.News, p. 504
 
 
 [52]
 Id. at 3, (1978) U.S.Code Cong. & Admin.News, p. 506
 
 
 [53]
 Id. at 3-4, (1978) U.S.Code Cong. & Admin.News, pp. 505-07
 
 
 [54]
 Id. at 4, (1978) U.S.Code Cong. & Admin.News, p. 507
 
 
 [55]
 See H.R.Rep.No.95-950, 95th Cong., 2d Sess. 8-10, reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 528, 530-32
 
 
 [56]
 Majority opinion, supra at 1123-1124
 
 
 [57]
 See text accompanying notes, 13-16 and 26-27 supra
 
 
 [58]
 500 F.2d 212 (5th Cir. 1974)
 
 
 [59]
 Bradley v. School Bd., 416 U.S. at 720, 94 S.Ct. at 2020
 
 
 [60]
 See text accompanying notes 13-16 supra
 
 
 [61]
 29 U.S.C. § 626(e) (1976)
 
 
 [62]
 Majority opinion, supra at 1122. The bulletin stated that "the act authorizes involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of § 4(f)(2)." 29 C.F.R. § 860.110 (1979)
 
 
 [63]
 29 U.S.C. § 259(a) (1976) (emphasis added)
 
 
 [64]
 Bradley v. School Bd., 416 U.S. at 720, 94 S.Ct. at 2020
 
 
 [65]
 Id. at 721, 94 S.Ct. at 2021
 
 
 [66]
 Bradley v. School Bd., 345 F.2d 310, 321 (4th Cir.) (en banc), vacated on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), cited in Bradley v. School Bd., 472 F.2d 318, 328 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)
 
 
 [67]
 472 F.2d at 327 (footnote omitted)
 
 
 [68]
 Id. at 327-31
 
 
 [69]
 416 U.S. at 721, 94 S.Ct. at 2021 (emphasis added)
 
 
 [70]
 Id
 
 
 [71]
 Bradley v. School Bd., 345 F.2d 310, 321 (4th Cir.) (en banc), vacated on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965)
 
 
 [72]
 416 U.S. at 721, 94 S.Ct. at 2021
 
 
 [73]
 See text following note 60 supra
 
 
 [74]
 See Brief for the Secretary of Labor as Amicus Curiae at 26, Sikora v. American Can Co., 622 F.2d 1116 (3d Cir. 1980)
 
 
 [75]
 Brennan v. Taft Broadcasting Co., 500 F.2d 212, 218 (5th Cir. 1974) (Tuttle, J., dissenting)
 
 
 [76]
 549 F.2d 901, 905-10 (3d Cir. 1977), cert. denied, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978)
 
 
 [77]
 542 F.2d 217 (4th Cir. 1976), rev'd, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977)
 
 
 [78]
 United Air Lines, Inc. v. McMann, 434 U.S. 192, 208, 98 S.Ct. 444, 452, 54 L.Ed.2d 402 (1977) (Marshall, J., joined by Brennan, J., dissenting)
 
 
 [79]
 Indeed, in Zinger v. Blanchette, 549 F.2d 901 (3d Cir. 1977), cert. denied, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), I joined Judge Weis' opinion, on which the Supreme Court relied in McMann, that held the 1967 Act inapplicable to involuntary retirements which are not subterfuges
 
 
 [80]
 The majority also observes that in Department of Water and Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Supreme Court, in deciding that its own interpretation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (1976), was not to be given retrospective effect, evinced special solicitude for the solvency of pension funds. Majority opinion, supra at 1123. In Manhart, the Court construed Title VII as forbidding employers from requiring female employees to make larger pension fund contributions because the average age expectancy of females is longer than that for males. Noting that "(d)rastic changes in the legal rules governing pension and insurance funds" can jeopardize their solvency, the Court stated that "the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result." 435 U.S. at 721, 98 S.Ct. at 1382. There is no question that the 1978 amendments to § 623(f) (2), which took effect on April 6, 1978, Pub.L. No. 95-256, § 2, 92 Stat. 189 (1978), applies to retirements that occur after that date, notwithstanding the fact that the retirement and pension plans, pursuant to which the retirements take place, might have been established long before. Thus, in setting the effective date of the amendments, Congress can be presumed to have considered their effect on existing pension plans. Absent a clear congressional directive to the contrary, or a determination that manifest injustice would result neither of which appear to be present here we are constrained by Bradley to apply the 1978 amendments to cases pending at the time it took effect as well as to future cases. But, American Can has pointed to no other age discrimination case presently pending against it. And, the statute of limitations for cases brought under the Act is extremely short. Section 626(d) requires aggrieved employees to file a charge alleging unlawful discrimination with the Secretary of Labor within approximately three months after the alleged violation, and § 626(e)(2) authorizes the tolling of the statute for no more than one year if the Secretary is attempting to effect voluntary compliance with the law. 29 U.S.C. § 626(d) & (e)(2) (Supp. II 1978). Thus,any person involuntarily retired prior to the enactment of the 1978 amendments may not now bring suit against American Can or any other employer. The effect on existing pension plans of retroactively applying the 1978 amendments therefore would appear to be de minimis. Under these circumstances, I do not believe that the concerns that troubled the Court in Manhart the effects of retroactive application of a change in law nationwide to all pension funds established by employer subject to Title VII, see 435 U.S. at 721-22, 98 S.Ct. at 1382 are applicable to this case