STATE of Ohio, ex rel. William J. BROWN, Attorney General of Ohio, et al., Plaintiffs,

v.

Donald GEORGEOFF, dba Summit National Services, et al., Defendants.

No. C81–1961.

United States District Court,
N.D. Ohio, E.D.

May 3, 1983.

Terrence Fay, Martha Horvitz, Martyn Brodnik, Asst. Attys. Gen., Columbus, Ohio, for plaintiffs.

Dennis Zapka, Asst. U.S. Atty., Cleveland, Ohio, David Ledbetter, Environmental Enforcement, U.S. Dept. of Justice, Washington, D.C., for amicus curiae plaintiff.

Wm. Falsgraf, Karen Newborn, Baker & Hostetler, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are the motions to dismiss of Browning-Ferris Industries of Ohio (BFIO) and Browning-Ferris Industries of Pennsylvania (BFIP) (collectively, BFI). BFI, the State of Ohio (Ohio), and *amicus curiae,* the United States Department of Justice (Justice), have submitted a series of briefs[1] relating to the issues raised by the motions to dismiss. For the reasons stated below, the motions to dismiss are denied.

This case arises out of Ohio's efforts to clean up the hazardous waste disposal site owned by Summit National Liquid Services (SNLS), commonly known as the Deerfield Dump (Dump). In its complaint, Ohio alleges that a broad assortment of hazardous wastes has been left at the Dump. Complaint ¶ 25. In 1979, SNLS went out of business and the Dump has subsequently passed through a series of owners. The waste, however, remains at the Dump and poses a continuing threat to the nearby Berlin Reservoir, a source of drinking water for the cities of Niles and Youngstown.

---

1. These briefs include BFIO and BFIP's virtually identical motions to dismiss (BFI motion to dismiss), Ohio's memorandum in opposition to the motions to dismiss (Ohio opposition brief), BFIO and BFIP's virtually identical reply briefs in support of the motion to dismiss (BFI reply to Ohio), brief of the United States as *amicus curiae* (amicus brief), reply brief of BFIO to amicus brief (BFI reply to amicus), supplemental brief of the United States as *amicus curiae* (supplemental amicus brief), and reply brief of BFIO to supplemental *amicus* brief (BFI reply to supplemental *amicus* brief). In addition, BFI, Ohio and Justice have all advised the Court, by letter, of subsequent decisions.

Ohio brought this action to collect the costs related to cleaning up the Dump from the defendants. The defendants fall into three categories—the former owners and operators of the Dump, the generators of the hazardous waste located at the Dump, and the transporters of the hazardous waste to the Dump. Ohio alleges that BFIO and BFIP transported waste to the Dump throughout the mid-1970s.[2]

In a 42 page complaint, Ohio alleges 14 causes of action against 42 defendants.[3] Counts 1–3 of the complaint allege violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq. This statute, which provides a mechanism for cleaning up hazardous waste dump sites, serves as the sole basis of federal jurisdiction in this case. The remaining counts, based upon pendant jurisdiction, allege an assortment of state law strict liability and nuisance claims against the defendants.

In its motions to dismiss, BFI asserts two sets of arguments which it believes absolve BFIP and BFIO from liability under CERCLA. BFI's first argument is that the liability provisions of CERCLA, particularly 42 U.S.C. § 9607(a), should not be construed to impose liability retroactively for acts of transporters which took place prior to CERCLA's enactment in 1980. BFI's second set of arguments present four different claims regarding Ohio's compliance with the statutory requirements for imposing liability under CERCLA. Should BFI prevail on any of these grounds, BFI urges the Court to dismiss the pendant state claims which comprise the remainder of the lawsuit.[4]

## I. RETROACTIVE APPLICATION OF CERCLA.

BFI argues that this Court should not construe CERCLA to impose liability for acts occurring before its enactment. At the outset, BFI urges the Court to find that imposition of liability to BFIP and BFIO for acts occurring before CERCLA's enactment would require a retroactive application of the statute. Next, BFI asserts that a presumption exists against construing statutes to allow such a retroactive application. BFI concludes by arguing that neither the language or the legislative history of CERCLA provide sufficient evidence of congressional intent to override this presumption against construing CERCLA to apply retroactively. Ohio and Justice, while challenging BFI's position with respect to each of these arguments, have substantially accepted this three-step process for analyzing BFI's claim.

In accordance with this scheme, the Court will now turn to an analysis of BFI's claim. First, the Court will determine whether application of CERCLA to the conduct of BFIP and BFIO requires a retroactive application of CERCLA. Second, if the Court finds that a retroactive application is required, the Court will then consider the presumptions and standards to be applied in determining whether a court should construe a statute to apply retroactively. Finally, the Court will determine whether the text and legislative history of CERCLA meet these standards for construing a statute to apply retroactively.

Before analyzing BFI's claim, the Court notes that this motion does not address the constitutionality of a retroactive application of CERCLA. The motion raises issues of statutory construction, albeit issues which have constitutional overtones. The Court recognizes that BFI reserves the right to advance a constitutional argument at a later date.

---

**2.** BFIO allegedly transported approximately 2.5 million gallons of hazardous wastes to the Dump between 1975 and 1977; BFIP allegedly transported 15,000 gallons of hazardous wastes to the Dump during 1976. Complaint ¶ 26.

**3.** Donald M. Georgeoff, the first-named defendant in the complaint, owned and operated the Dump during the relevant period.

**4.** Alternatively, BFI seeks dismissal of counts 5–8 of the complaint, arguing that these counts fail to state a claim in nuisance or strict liability. The Court will defer decision on these claims until a later date.

A. *Does Ohio's claim against BFIO and BFIP require a retroactive application?*

The classic definition of a retroactive application appears in *Society for Propagating the Gospel v. Wheeler,* 22 F.Cas. 756 (C.C.D.N.H.1814) (No. 13,156). In that case, Justice Story defined a retroactive application as one which " . . . creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past . . . .". *Id.* at 767. For the purposes of this opinion, the critical phrase in that definition is "transactions or considerations already past." Subsequently, courts have developed this portion of the definition by stating that " 'a statute is not retroactive merely because it draws upon antecedent facts for its operation.' " *Neild v. District of Columbia,* 110 F.2d 246, 255 (D.C.Cir.1940) (citations omitted). Taken together, these authorities stand for the proposition that a statute will not require a retroactive application because it draws upon antecedent facts for its operation, but it may not impose liability based solely upon considerations already past without applying retroactively.

Ohio and Justice have taken two distinct approaches to escaping the need to seek a retroactive application of CERCLA. Ohio urges the Court to create an exception to this definition—one which would allow a statute to rely solely upon past acts without finding the statute to apply retroactively. Justice, on the other hand, accepts the definition in *Wheeler* but urges that the occurrence of a "continuing release" of hazardous wastes at the Dump represents sufficient post-enactment conduct to hold BFIO and BFIP liable without a retroactive application of CERCLA.[5]

Ohio seeks to limit the definition of retroactivity,[6] by citing a series of cases where courts have held that a statute was not being applied retroactively. *See e.g. United States v. Jacob,* 306 U.S. 363, 59 S.Ct. 551, 83 L.Ed. 763 (1939); *Lewis v. Fidelity & Deposit Co.,* 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425 (1933); *Reynolds v. United States,* 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353 (1934); *Cox v. Hart,* 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332 (1922); *United States v. Diamond Shamrock Corp.,* No. C80–1857 (N.D.Ohio, May 29, 1981) (order denying defendant's motion for summary judgment). Relying on these authorities Ohio asserts that " 'a statute is not rendered retroactive merely because facts or requisites upon which the acts subsequent action depends or some of them are drawn from a time antecedent to enactment.' " Ohio opposition brief at 8 (quoting *Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934)).

The principle underlying this argument is illustrated by the case of *United States v. Jacobs,* 306 U.S. 363, 59 S.Ct. 551, 83 L.Ed. 763 (1939). In *Jacobs,* the taxpayer argued that a provision of the 1924 Revenue Act relating to the valuation of property included in the taxpayer's decedent's estate was being applied retroactively. Taxpayer had purchased the property in 1909, but died in 1924, after the effective date of the Revenue Act. The *Jacobs* court ruled that the statute was not being applied retroactively. Decedent's death, the triggering event for initiating the determination of valuation, occurred after the Revenue Act's enactment. The statute, though depending upon some facts or conditions occurring before the enactment of the tax, did not operate

5. Under *Wheeler,* a statute which does not impose a new obligation, duty, or disability is not a retroactive law, even if it applies to past occurrences.

6. All of the parties have made extensive references to the statutory language of CERCLA in response to the question of whether Ohio's claim against BFI requires a retroactive application of the statute. In their briefs and in argument, the parties have made rather complex linguistic arguments regarding the con-

struction of the statutory language. The issue of what constitutes a retroactive law, however, is a legal issue which transcends individual acts of Congress. In short, a retroactive law is a retroactive law, regardless of whether Congress intends it to be a retroactive law or not. These citations to the statutory language, therefore, are incapable of altering this definition. Nonetheless, this Court will consider this material when it reaches to the issue of Congressional intent.

retroactively. *Jacobs,* therefore, is distinguishable from the case *sub judice* because Ohio has not alleged any activity by BFIP or BFIO taking place after the December 1980 passage of CERCLA.

The recent decision in *United States v. Diamond Shamrock Corp.,* interpreting the Resource Conservation and Recovery Act of 1976 (RCRA), an analogous statute, is also distinguishable. In that case, Diamond Shamrock retained control of the dump site. The Court, therefore, concluded that a grant of injunctive relief against a defendant who continued to maintain control of the dump site did not involve a retroactive application of the statute. By definition, this relief applied only to future conduct, and the Court's order did not raise the issue of retroactivity. *Id.* at 8–9.

The *Diamond Shamrock* decision illustrates an important distinction which underlies the Court's analysis of this issue. Because Diamond Shamrock retained control of the dump after the date of the statute's passage, liability could be premised upon continuing to maintain the dump in an improper condition. The *Diamond Shamrock* Court did not impose liability for placing the waste at the dump before RCRA's enactment. It relied solely upon Diamond Shamrock's failure to remove the waste after RCRA's enactment. *See* Note, *Generator Liability under Superfund for Clean-up of Abandoned Hazardous Waste Dumpsites,* 130 *U.Pa.L.Rev.* 1229, 1237 (1982).

In light of this analysis, this Court finds Ohio's argument is not well taken. There is no authority for finding that an imposition of statutory liability premised solely upon past acts does not require retroactive application of the statute. The cases cited by Ohio all involve some form of post-enactment conduct. Ohio, therefore, has failed to prove that it may impose non-retroactive liability upon BFIP and BFIO without alleging some post-enactment activity on their part. Thus, Ohio is limited, by necessity, to a retroactive application of CERCLA.

The Court next turns to a consideration of Justice's position. Under the liability provisions of CERCLA, 42 U.S.C. § 9607(a), a "release or threatened release" of hazardous wastes is required to trigger liability. Justice argues that the release at the Dump is a continuing release of hazardous waste triggering liability at any time before the wastes' removal. Because the waste has yet to be removed, BFI has engaged in conduct taking place after the enactment of CERCLA. Imposition of liability, therefore, would not be retroactive because at least some of the facts giving rise to the liability are based on events taking place after the enactment of CERCLA.

In support of this argument, Justice cites a number of cases which it argues hold that legislation designed to alleviate a continuing public nuisance does not act retroactively. *Samuels v. McCurdy,* 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1924); *Chicago & Alton Railroad Company v. Transbarger,* 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 204 (1914); *City of Bakersfield v. Miller,* 64 Cal.2d 93, 410 P.2d 393, 48 Cal.Rptr. 889 (1966); *People of Illinois v. Jones,* 329 Ill. App. 503, 69 N.E.2d 522 (4th Dist.1946). The Supreme Court's decision in *Transbarger* is illustrative of this line of cases. That case involved a. challenge to a statute requiring an outlet for running water in all bridge embankments. Plaintiffs, who had built a bridge without an outlet three months before the passage of the statute, challenged this statute on a theory of retroactivity. The Supreme Court held that the statute was not applied retroactively because the statutory violation was not solely based on conduct "done or omitted before the passage of the Act ... but because after that time [the passage of the Act] it [the railroad] maintained the embankment in a manner prohibited by that Act." 238 U.S. at 73, 35 S.Ct. at 680.

Justice interprets this case to stand for the proposition that legislation designed to protect the general health and welfare will be found not retroactive where the defendant's past conduct creates a serious public nuisance. The ruling in *Transbarger,* however, is inapplicable to BFIP's and BFIO's

situation. The basis for liability in *Transbarger* is the railroad's continuing failure to correct the nonconforming bridge, not the railroad's past creation of a dangerous bridge. This failure to correct the nuisance is a present, not an antecedent, act and imposition of liability in this situation is not retroactive. *Transbarger,* therefore, is distinguishable from this case on the basis of the railroad's continuing ownership and use of the nonconforming bridge. Even though the bridge was built before the passage of the statute, the railroad continued to use the bridge after passage. In contrast, Ohio has not alleged any control or use of the Dump by BFIP or BFIO after the December 1980 passage of CERCLA. The complaint, therefore, fails to allege any conduct which will allow a non-retroactive application of CERCLA.

The distinction based upon continuing ownership, possession or control of the Dump represented by this Court's analysis of *Diamond Shamrock,* therefore, would also prevent application of *Transbarger* to BFIO and BFIP. While this Court has acknowledged the factual basis underlying this distinction, the question remains, however, whether there is a legal reason for distinguishing between transporters whose conduct requires a retroactive application of the statute and transporters whose conduct does not require retroactive application of CERCLA.

BFI supports the distinction based upon continuing ownership, possession, or control by analogy to the common law of tort. Transporters who deliver goods without incident have never been held liable under the law of strict liability for subsequent injuries caused by these goods, while producers and eventual sellers have been held liable. The courts have concluded that a tort occurring after the proper delivery of a defective product does not give rise to liability on the part of the transporter because of the concept of intervening cause. BFI further supports this position by nothing that § 9607(a) deals with questions of owner, operator, and transporter liability separately and that the provisions for transporter liability are not nearly as broad as those for other categories of potential defendants.

Ohio responds by suggesting that the concept of intervening cause is inapplicable to the defense of a CERCLA action. The statute carefully limits the defenses available to a defendant in a CERCLA action. *See* 42 U.S.C. § 9607(b). That provision does not list intervening cause as a potential defense. From that omission, Ohio argues that the defense of intervening cause is unavailable to a defendant in a CERCLA case, a position further buttressed by CERCLA's specific allowance for a defense based on the conduct of third parties without referring to intervening cause. *See* 42 U.S.C. § 9607(b)(3).

Alternatively, Ohio suggests that the relevant body of tort common law is nuisance and claims that under nuisance theory, actions taken with the knowledge of the potential risk are actionable. Consequently, intervening cause would not be available to a transporter who delivered a dangerous product to a dump it knew was substandard. A distinction based on ownership is inappropriate; the relevant issue is knowledge of creation of a risk. The actions of the owners of the SNLS site, therefore, are not an intervening cause.

These different positions on the viability of a distinction based on continuing ownership, possession or control present two questions. Would general tort theory recognize intervening cause as a bar to a finding of liability where a transporter delivered a product, without incident, to a facility selected by the transporter? Assuming, *arguendo,* that tort theory would bar such a finding of liability would the § 9607(b) limitation of defenses change this result?

Resolution of this first question requires an inquiry into the nature of the § 9607 cause of action to determine the analogous body of tort law. Should the Court conclude that the analogous tort doctrine is strict liability, as BFI argues, then the concept of intervening cause, which is a part of strict liability doctrine, would apply and would justify the distinction. On the other hand, should the Court conclude that the analogous tort doctrine is nuisance, as Ohio argues, then the concept of intervening cause would not apply and would not justi-

fy the distinction. While § 9607 creates a new form of action, the Court finds it significant that Congress principally discussed the § 9607 action in the context of strict liability, not nuisance, doctrine. *See* S.Rep. No. 848, 96th Cong., 2d sess. 32, 96 (1980); Cong.Rec. S 12,917 (daily ed. Sept. 18, 1980) (remarks of Sen. Cannon). Cong.Rec. H 9462–65 (daily ed. Sept. 23, 1980) (remarks of Rep. Gore); *id.* at H 11,787–88 (daily ed. Dec. 3, 1980) (remarks of Rep. Florio); Based on this analysis, the Court concludes that general tort theory would apply the concept of intervening cause to the § 9607 action, thereby justifying the distinction.

This leaves Ohio's argument that the § 9607(b) limitation of defenses changes this result. That section, however, is inapplicable. Intervening cause does not act as a defense; rather, it acts to negate causation, an element of the § 9607 cause of action. The § 9607(b) limitation of defenses, therefore, does not apply.

■ In light of this analysis, the Court finds that the complaint fails to allege any conduct on BFIO or BFIP's part which took place after the enactment of the statute. Further, Ohio's and Justice's attempts to argue that liability may be imposed for past acts where there is no post-enactment conduct are unpersuasive. The Court concludes that BFIP's and BFIO's liability may properly be distinguished from the case law cited by Ohio and Justice on the basis of BFIP's and BFIO's failure to maintain continuing ownership, possession, or control of the Dump. Accordingly, the Court concludes that Ohio's attempt to impose CERC-LA liability upon BFIO and BFIP requires a retroactive application of CERCLA.

B. *What presumptions apply in determining whether CERCLA should be interpreted to impose retroactive liability?*

Having determined that the imposition of liability upon BFIO and BFIP for their pre-enactment conduct requires a retroactive application of CERCLA, the Court must now turn to the question of whether CERCLA should be construed to provide for retroactive application. This inquiry proceeds in two stages. The Court must initially determine the standard to be applied in determining whether a statute should be applied retroactively. Then, the Court may proceed to determine whether that standard has been met with respect to CERCLA.

■ As a general rule, the courts do not favor retroactive application of statutes. Problems of lack of notice and interference with "vested rights" may result from a retroactive application. These concerns may rise to constitutional proportions. In any case, concepts of fundamental fairness and the policy of construing statutes to avoid constitutional issues have historically resulted in a presumption favoring a prospective only application of a statute—a presumption which can be overridden in only limited circumstances.[7] *See J. Sutherland, Statutes and Statutory Construction,* § 41.04 (4th ed. 1975).

Most recently, in *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), the Supreme Court adhered to the

---

**7.** Procedural and remedial statutes have always been excepted from this rule and have been applied retroactively. Ohio seeks to bring CERCLA within this exception. At the outset of the analysis of this portion, the Court must determine whether CERCLA is remedial or substantive within the parameters of this rule. Both of the cases cited to the Court involve long-arm statutes for obtaining personal jurisdiction. See *Howard v. Allen,* 368 F.Supp. 310, 315 (D.S.C.1973), *aff'd without opinion* 487 F.2d 1397 (4th Cir.1973), *cert. denied,* 417 U.S. 912, 94 S.Ct. 2611, 41 L.Ed.2d 216 (1974); *Bagsarian v. Parker Metal Co.,* 282 F.Supp. 766 (N.D.Ohio 1968). Acknowledging that "[w]hile the distinction between remedial and substantive legislation is rather uncertain ... [a] remedial statute is generally defined as one which

neither enlarges nor impairs substantive rights, but rather relates to the means and procedure for enforcing those rights," *Bagsarian v. Parker Metal Co.,* 282 F.Supp. at 769–70, it can hardly be contended, however, that this statute involves remedial legislation of this type. CERCLA creates an entirely new procedure for enforcing substantive rights—a procedure which was the purpose for enacting the statute.

As a corollary to this argument Justice asserts that environmental statutes are subject to a different definition of "remedial." Under Justice's view, statutes "designed to remedy continuing threats and injuries to the public health and the very environment which sustains us," supplemental amicus brief at 6, also qualify as "remedial" statutes and are entitled

presumption against retroactivity in ruling that a change in a regulation did not apply retroactively. The Court stated that:

"[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'"

Id. at 160, 84 S.Ct. at 621–22 (quoting *Union Pacific R. Company v. Laramie Stock Yards Company,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). *See United States v. Heth,* 7 U.S. (3 Cranch) 399, 2 L.Ed. 479 (1806). BFI views the relevant portions of this language as the words "unequivocal" and "manifest." Interpreting unequivocal to mean "non-ambiguous, clear" and manifest to mean "obvious to the understanding," BFI argues that *Greene* requires Ohio to satisfy a high burden of persuasion to override the presumption.[8]

The viability of *Greene* as precedent, however, is subject to some debate.[9] Regardless, this Court concludes that even if it were to apply the presumption against retroactive application embodied in *Greene,* it would find that the presumption had been overridden. Thus, the Court need not reach

---

to retroactive application. In support of this position, BFI cites the decision in *United States v. Diamond Shamrock Corp.,* No. C80–1857 (N.D.Ohio, May 29, 1981) as authority for the view that the generous construction required by law for statutes relating to water pollution allows a retroactive application of CERCLA. *Id.* (Slip opinion at 10).

Upon review, the Court finds that *Diamond Shamrock* is inappropriately cited in this case. The principal thrust of *Diamond Shamrock* is to grant a generous construction to the definitional terms of the statute, not the issue of retroactivity. *Diamond Shamrock* is inappropriately cited for the proposition that the definition of "remedial" statutes is to be altered to include CERCLA. Accordingly, this Court concludes that CERCLA does not fall within this exception to the presumption against retroactive application.

Justice also argues that *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), removes public health statutes, like CERCLA, from any presumption against retroactive application. In *Turner Elkhorn,* the Supreme Court upheld the constitutionality of a retroactive application of provisions of the Coal Mine Health and Safety Act of 1969 relating to compensation for victims of black lung disease. *Id.* at 15–16, 96 S.Ct. at 2892–93. In *Turner Elkhorn,* the Court found "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Id.* at 16, 96 S.Ct. at 2893. The Court went on to note the particular susceptibility of claims involving public nuisance to this type of analysis.

*Turner Elkhorn,* however, did not involve the issue raised by this case. That case addressed the constitutionality of a statute which clearly provided for retroactive application. The Court did not face the issue of statutory construction. BFI has specifically stated that they are not raising a constitutional claim in this motion; the *Turner Elkhorn* case, therefore, is inapposite to the issue raised by this claim. *Turner Elkhorn* stands for the proposition that a retroactive application is constitutional; it does not stand for the proposition that a retroactive application is favored.

Although *Turner Elkhorn* dealt only with the constitutional issue, that decision and its progeny suggest that there is substantial authority for upholding the constitutionality of a retroactive application of CERCLA. Since the principal basis for the presumption against retroactivity is the threat of raising a constitutional issue, the reduction of that constitutional issue must necessarily reduce the need to interpret CERCLA to avoid raising that constitutional issue. The weight of the presumption therefore being reduced, a more lenient approach in reviewing claims that the presumption has been overridden may be appropriate.

8. Alternatively, Ohio urges the Court to adopt a view that the presumption against retroactivity does not impose a burden of proof at all. Ohio views the presumption as a guide to be used in the absence of evidence of Congressional intent. In this sense, Ohio is viewing the presumption in terms of a "bursting bubble." Ohio argues, therefore, that upon presentation of evidence regarding a Congressional intention to impose liability retroactively, the presumption disappears. In consideration of this view, it should be noted that, traditionally, bursting bubble presumptions have been used as a vehicle to draw out testimony from witnesses who might otherwise remain silent. That type of policy does not appear applicable to the use of the presumption in this case.

9. The Supreme Court has historically maintained a parallel, but seemingly contradictory, rule with regard to a change in the law during the pendency of an appeal. In *United States v.*

the question of *Greene's* continuing viability and will now turn to an examination of CERCLA and its legislative history under the *Greene* standard.

## C. Has Congress overridden the presumption against applying CERCLA retroactively?

The Court now turns to the statute and its legislative history to determine whether

*Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), Chief Justice Marshall, writing for the Court, stated that the Court must apply a treaty ratified by Congress during the pendency of the appeal. While the Court limited its holding to cases implicating great national concerns and intimated that the presumption against retroactivity would remain in cases involving mere private parties, *id.* at 110, the Court has always stood by its decision in *Schooner Peggy* and has extended the decision to a range of cases where the law changes during the pendency of an appeal.

In *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) and *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Supreme Court finally confronted the task of reconciling these two seemingly contradictory approaches to retroactivity. *Bradley,* for example, involved an appeal of an award of attorneys fees to plaintiff's counsel in a desegregation case. During the pendency of the appeal, Congress enacted legislation authorizing federal courts to award reasonable attorneys' fees. Relying on *Schooner Peggy,* the Court stated that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. Most importantly, the *Bradley* court viewed *Greene* as an example of a situation where the "manifest injustice" exception to the rule of *Schooner Peggy* applied. Id. at 716–17 & n. 24, 94 S.Ct. at 2018–19 & n. 24.

While both *Thorpe* and *Bradley* involved cases where the change in law occurred while the case was on appeal, their reasoning is applicable to the entire field of retroactivity. After *Thorpe* and *Bradley,* the presumption against retroactivity has arguably been changed to a presumption in favor of retroactivity. That presumption can only be overridden where there is a clear legislative directive to limit the statute to a prospective application or the change in law would cause manifest injustice to the party adversely affected.

Even after *Thorpe* and *Bradley,* some courts continue to apply the presumption against retroactivity. Some courts, relying on the

Congress has overridden the presumption against applying CERCLA retroactively. In *Windsor v. State Farm Insurance Co.,* 509 F.Supp. 342 (D.D.C.1981), Judge Sirica presented a framework for analyzing this type of claim. He stated that:

The Court's analysis must begin with the fundamental rule of law that the meaning intent of a statute is to be sought first in the language in which it is

*Schooner Peggy* injunction to "struggle hard against a construction which will ... [result in] a retrospective operation," 5 U.S. at 110, have used the manifest injustice exception to the rule in *Bradley* to avoid a retroactive application of a new law. Several other courts have declined to follow *Bradley* in cases where the change created a new cause of action. *See Weise v. Syracuse University,* 522 F.2d 397, 410–11 (2nd Cir.1975). *See also Jones v. City of San Antonio,* 568 F.2d 1224, 1225–26 (5th Cir.1978); *Faulkner v. Federation of Pre-School and Community Education Centers, Inc.,* 564 F.2d 327, 328 (9th Cir.1977); *Monell v. Dept. of Social Services,* 532 F.2d 259, 261–62 (2nd Cir. 1976), *rev'd on other grounds,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 822 n. 4 (7th Cir.1975); *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (all cases involving the question of whether the 1972 amendments to Title VII of the Civil Rights Act of 1964, deleting the exemptions for state and local employees, applied retroactively). Finally, some Courts have simply ignored *Thorpe* and *Bradley* and have gone on to apply the presumption against retroactivity enunciated in *Greene. See Weatherington v. Moore,* 577 F.2d 1073, 1075 (6th Cir.1978); *In re Surface Mining Regulation Litigation,* 452 F.Supp. 327, 339 (D.D.C.1978).

Unfortunately, the conflicts between these various approaches have not always been reconciled, or even recognized by the Courts. *See Iowa Power and Light Company v. Burlington Northern, Inc.,* 647 F.2d 796, 805 (8th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). In this case, the parties have assumed the applicability of *Greene,* without articulating the approach they have followed to reach their conclusion. Under the analysis embodied in this opinion, this Court need not decide the issues surrounding the applicability of *Greene.* Obviously, this Court's conclusion that CERCLA may be applied retroactively under the *Greene* standard also represents a conclusion that CERCLA may be applied retroactively under the *Bradley* standard.

For an excellent discussion of the existing law on the presumption against retroactivity, *see Sikora v. American Can Co.,* 622 F.2d 1116, 1124–35 (3d Cir.1980) (Adams, J. dissenting).

framed. If that language is plain and unambiguous, then there is no need to enlist the rules of interpretation, and the duty of the Court is to enforce the act according to its terms. . . .

*Id.* at 344. Judge Sirica went on to note that where "the imperative character necessary to demonstrate retroactive intent cannot be assigned to the words of the Act," the Court must then look at the various indicia of Congressional intent. *Id.* Following this analysis, this Court will initially consider the language of CERCLA, and then, only if necessary, review the legislative history.

Although Ohio, as the party attempting to override the presumption, bears the burden of persuasion on the issue of legislative intent, the analysis is assisted by an understanding of BFI's position. BFI presents a two-fold position with regard to the legislative intent issue. BFI argues that the statutory silence with regard to retroactivity is dispositive, or at least highly persuasive, on the question of Congressional intent. In addition, BFI argues that the legislative history does not provide a clear enough indication of legislative intent to override the presumption.

### 1. Statutory provisions.

The parties are in accord that there are no unequivocal statements in the statute indicating a Congressional intent to make it apply retroactively. It would have been a simple matter for Congress to have included a provision within the Act providing that liability would be imposed retroactively. Given the undoubted Congressional awareness of an existing problem, this omission takes on special importance. There can be no question that Congress was aware that the issue of retroactivity could arise. Yet, Congress failed to make this statement.

In the absence of explicit statutory language indicating an intent to apply CERCLA retroactively, Ohio asks this Court to infer such an intent from the terms of a number of CERCLA's provisions. Ohio's principal argument is based on 42 U.S.C. § 9607(a), especially subsection (4), the provisions providing for civil liability. That statute provides:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

42 U.S.C. § 9607. BFI argues that this statute is at best ambiguous and that the language does not constitute the "imperative character necessary to demonstrate retroactive intent."

Ohio argues that the wording of § 9607(a)(4) indicates a Congressional intent to apply the liability provisions of CERCLA retroactively. Ohio's principal focus is upon the phrase in subsection (a)(4) extending liability to "any person who *accepts* or *accepted*[10] any hazardous sub-

---

**10.** The somewhat confused legislative development of the phrase "accepts or accepted" weakens the force of Ohio's argument. In the Senate report on S.1480, the Senate version of CERCLA, this provision of the statute read "any person who *accepts* any hazardous substances for transport." S.Rep. No. 848, 96th Cong., 2d. Sess. 31 (1980) (emphasis added).

stances for transport."[11] Using the date of CERCLA's enactment as a point of reference, Ohio argues the future tense verb "accepts" refers to liability for conduct taking place after CERCLA's enactment. With this interpretation, and relying upon the maxim of statutory construction that a statute is to be construed so as to give meaning and effect to each of its words, Ohio then argues that the past tense verb "accepted" must be construed to apply to conduct occurring before the enactment. To construe the word otherwise, would be to give it no effect and to violate the maxim of statutory construction.

Application of this analysis to a construction of § 9607(a)(3), the provision providing for generator liability, produces an anomalous result and requires rejection of Ohio's proposed construction. Under Ohio's view, a past tense verb in § 9607(a)(3) would suggest application to pre-enactment occurrences, and a present or future tense verb would apply to post-enactment occurrences. This section, however, does not contain a present or future tense verb, only a past tense verb. Under Ohio's view, therefore, this provision would only apply to generators who arranged for disposal before the enactment of CERCLA, and not those who arrange for disposal after the enactment of CERCLA. Such a construction produces the anomalous result of providing for a

retroactive, but not a prospective, application of the statute, a result which Congress could not have intended.

A more proper view is to read the phrase "accepts or accepted" from the perspective of the time of a release or threatened release, a view supported by the language of § 9607. Under § 9607, two events must take place before any liability accrues. The individual must fall within one of the categories specified by subsections 1–4 of § 9607(a) and a release or threatened release must occur. It therefore makes sense to interpret the former event, the act by the individual, in the context of the latter event, the release or threatened release.

Construing the phrase "accepts or accepted" from the time of a release, the word "accepted" will apply to all impositions of liability under CERCLA; the act of accepting the hazardous wastes will have always taken place before the occurrence of a release which causes the incurrence of response costs. Transporters who acted after the enactment of CERCLA will be held liable as having "accepted" hazardous wastes. It will be unnecessary to construe the word "accepted" to apply to pre-enactment conduct to give it effect.[12] "Accepted" may apply to pre-enactment conduct, but the statute does not require such an application.

The words "or accepted" do not appear in this report and do not appear in the Senate version of CERCLA until much later, when they were incorporated into a substitute form of the bill. *See* Cong.Rec. S14,719 (daily ed. Nov. 19, 1980). At that time, the addition of the words "or accepted" passed unnoticed—hardly the response which would be expected if Congress attached any significance to the addition.

11. At oral argument, Ohio and Justice also argued that the words "*selected* by such person" in § 9607(a)(4) also indicate a congressional intent to apply CERCLA retroactively. Upon review, this Court finds that argument unpersuasive. The word "selected" applies equally to future, as well as past, applications of the statute. In fact, no other form of the verb "select" would make sense in this position.

12. This construction of § 9607(a)(4) makes the word "accepts" virtually meaningless. At most, "accepts" will apply to transporters who accept hazardous substances for transport to

facilities from which a release is presently occurring. While the Court is uncomfortable with this result, given the problems presented by the other proposed constructions of the words "accepts or accepted," the Court concludes that this is the most reasonable construction.

The awkwardness of this phrase may be explained by the context of CERCLA's passage. CERCLA was rushed through a lame duck session of Congress, and therefore, might not have received adequate drafting. In fact, during the final House debates, a number of Congressmen identified over forty drafting errors on the bill which became CERCLA. *See* Cong.Rec. H11,-790 (daily ed. Dec. 3, 1980) (remarks of Rep. Broyhill); *id.* at 11,796 (remarks of Rep. Snyder). For a general discussion of the problems attendant to construing hastily drafted legislation, *see Scarborough v. United States,* 431 U.S. 563, 569–71, 97 S.Ct. 1963, 1966–67, 52 L.Ed.2d 582 (1977).

A number of other provisions of CERCLA support the view that CERCLA applies to pre-enactment conduct. CERCLA frequently refers to "inactive" waste disposal sites, thereby indicating Congressional intent to focus on past, rather than future, conduct.[13] Also, CERCLA authorizes reimbursements from the Superfund for response costs arising before CERCLA's enactment, indicating that at least some of the provisions of CERCLA apply retroactively.[14] Finally, the § 9607(f) prohibition on recovery for injuries to natural resources occurring before CERCLA's enactment suggests, by implication, that a similar prohibition does not apply to other response costs.[15] These provisions only serve to support Ohio's attempt to override the presumption.

Despite these statutory arguments, the Court is unable to declare that the statute evidences the "imperative character" required to overcome the presumption against retroactivity. Regardless, these provisions provide some evidence that Congress intended CERCLA to apply retroactively. The Court, therefore, will consider these statutory terms as indicia, but not dispositive indicia, of a Congressional intent to allow retroactive application of CERCLA.

### 2. Legislative History.

Having determined that the statutory language does not require or preclude a retroactive application of CERCLA, the Court next turns to an examination of the legislative history. The precise issue of retroactivity raised by BFI's motion was not addressed in the Congressional debates.[16] A more generalized examination

---

13. See e.g., Preamble to CERCLA (purpose of CERCLA is "to provide for ... the clean up of inactive hazardous waste disposal sites"); 42 U.S.C. § 9601(20)(A)(iii) ("in the case of any abandoned facility ..."); H.Rep. No. 1016, 96th Cong., 2d Sess., pt. I at 22 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News at 6119, 6125 ("It is the intent of the Committee ... [to] establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.").

14. See 42 U.S.C. §§ 9604(c)(3), 9611(d)(1). BFI, in response, argues that these provisions only authorize state action to clean up existing dump sites. They do not authorize suits against individuals responsible for creating the hazard, nor does such a reading necessarily have to follow from CERCLA.
 This discussion illustrates another important principle which underlies this opinion. CERCLA authorizes the state to engage in clean up operations. Also, CERCLA authorizes the state to initiate lawsuits to recover the costs of clean up from individuals like the defendants in this case. The extent of the state's authority under these two provisions, however, is not necessarily coterminous. It is both logically possible and a more proper reading of the statute to suggest that there are clean up operations which the state is authorized to perform for which it may not recover in a § 9607 lawsuit. In those cases, the state, apparently, is directed to look to the Superfund for reimbursement for these costs. A finding that the state is authorized to incur a particular clean up cost, therefore, does not necessarily indicate that the state is authorized to recover under § 9607 for that same cost.

15. In relevant part, 42 U.S.C. § 9607(f) provides that "There shall be no recovery ... [for damages to natural resources] where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980." Ohio argues that, by implication, the reverse is true; liability will be imposed for other damages which occur wholly before the enactment of this act. See, Note, 130 U.Pa.L.Rev. at 1241. As further support for its position, Ohio argues that its reading of this provision is in accordance with the general policy of the CERCLA to provide for liability among those individuals responsible for releases of hazardous substances.

16. The most relevant statements on this issue took place during a colloquy on the floor of the House involving then Congressman David Stockman and Congressman Albert Gore, one of CERCLA's sponsors. In opposition to an amendment broadening the liability provisions of CERCLA, Congressman Stockman said
 I would like to suggest to the members of this House that some day down the road about a year from now they are going to receive a letter from a company in their district that has just received a $5 or $10 million liability suit from EPA that was triggered by nothing more than a decision of a GS–14 that some landfill, some disposal site somewhere, needed to be cleaned up and, as a result of an investigation that his office did, he found out that company in your district contributed a few hundred pounds of waste to that site thirty years ago.
 . . . . .
 [And once EPA has] found that deep pocket, they will immediately go to court and sue

of the Congressional debates concerning CERCLA indicates an unequivocal Congressional intent to effect the complete clean up of the existing hazardous waste facilities. Senator Tsongas stated that "[t]he need for an emergency Federal response to deal with abandoned waste sites and chemical spills is real, and it is immediate." Cong.Rec. S 14,973 (daily ed. Nov. 24, 1980). Senator Danforth also stated that "We have no time to lose. Hazardous wastes are produced daily; we cannot put them on hold while we dally through deliberation.... I believe the clear consensus is that we must clean up abandoned hazardous dump sites as soon as possible...." Id. at S 14,977. See also id. at S 14,971 (remarks of Sen. Bradley); id. at S 14,977 (remarks of Sen. Dole); id. at S. 15,003 (remarks of Sen. Leahy and Chaffee); id. at S. 15,007 (remarks of Sen. Riegle); Cong.Rec. H 11,793 (daily ed. Dec. 3, 1980) (remarks of Rep. Vento); id. at 11,798 (remarks of Rep. Eckhardt).

It is also clear from the Congressional debates that Congress intended to have the chemical industry pay for the costs of this clean up. EPA argued that "society should not bear the cost of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dump site owner-operator who has profited or otherwise benefited from commerce involving these substances and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created .... relieving industry of responsibility establishes a precedent seriously adverse to the public interest ...." S.Rep. No. 848, 96th Cong., 2d Sess. 98 (1980). On the Senate floor, Senator Chaffee stated that "governments must have a tool for holding liable those who are responsible for those costs." Cong.Rec. S 15,003 (daily ed. Nov. 24, 1980). See also, id. at S. 14,971 (remarks of Sen. Tsongas); id. at S. 14,971–72 (remarks of Sen. Bradley); Cong.

Rec. H 11,799 (daily ed. Dec. 3, 1980) (remarks of Rep. Jeffords).

In sum, these authorities show two strands of Congressional intent. The supporters of this bill intended to provide for the clean up of old dump sites. In addition, there is little doubt that Congress intended for those individuals who were responsible for creating the hazards from these wastes to bear the cost of the clean up.

BFI argues, however, that there is some ambiguity in this second element of Congressional intent. Congress might not have intended to subject industry to § 9607 actions. Under CERCLA, industry is required to pay a special tax to finance the Superfund, see 26 U.S.C. §§ 4661–62, as well as bear the potential liabilities of § 9607 actions. BFI argues that Congress may have been referring to this "tax" liability when these Congressmen spoke of making industry pay for the clean up. To extend these statements to cover § 9607 actions, therefore, requires some stretching of the language and there is very little reason to believe, in BFI's view, that they indicate congressional intent to impose retroactive liability through these lawsuits.

This argument brings us to the head of the dispute between the parties. The legislative intent clearly indicates and the parties agree, that Congress intended to provide for the clean up of the existing hazardous waste facilities with the passage of CERCLA. The dispute between the parties, however, involves the means for accomplishing that clean up.

The Superfund will provide $1.6 billion to be used for that goal. The parties disagree, however, as to whether the $1.6 billion Superfund, standing alone, will allow accomplishment of this goal. Ohio argues that in order to fulfill its purpose, the Superfund must be supplemented by lawsuits which impose retroactive liability upon transport-

---

that deep pocket, and then all the onus of the law, all of the burden will be on him to prove that he was not responsible for an outcome that occurred thirty years later as a result of this retroactive liability.

Cong.Rec. H9466 (daily ed. Sept. 23, 1980). Congressman Stockman's position, which was also cited in the Senate debates, id. at S14,979 (daily ed. Nov. 24, 1980), and the popular press, see id., proved unpersuasive with the Members of Congress.

ers. BFI, however, contends that the $1.6 billion will provide sufficient funds without these lawsuits. Based upon this Court's analysis of the legislative history of CERCLA, the Court concludes that these lawsuits are required.

At the time that CERCLA was enacted, Congress was aware that the costs of the clean up it envisioned would greatly exceed the amount of the Superfund. The legislative history of CERCLA is replete with references to the scope of the problem which Congress faced. Congressmen referred to dump sites requiring clean up numbering in the thousands. Cong.Rec. H 9175 (daily ed. September 19, 1980) (remarks of Rep. Findley.) ("nearly 2,000 [sites] may pose an immediate threat to the environment and public health"). The costs for each clean up varied, but numbers in excess of $3 million per site were made throughout the legislative history. A range of figures developed regarding the total cost for this clean up. At a minimum, the low estimate for the clean up was in excess of $7 billion. S.Rep. No. 848, 96th Cong., 2d Sess. 2. The highest figure, a figure supported by EPA, placed the total cost for the clean up at $44 billion. Cong.Rec. H 9177 (daily ed. September 19, 1980) (remarks of Rep. Railsback). Other references placed the expected cost of the clean up in the range of $13.1 to $22.1 billion. H.R.Rep. No. 1016, 96th Cong.2d Sess. 20.

Obviously, the $1.6 billion Superfund itself will not provide sufficient funds for the clean up of the existing dump sites without some provision for lawsuits against private parties. BFI, however, argues that imposing liability upon defendants other than transporters will provide sufficient funds to allow the Superfund to complete the required work. Ohio and Justice strenuously oppose this position, arguing that this type

of transporter liability is required to make the system work.[17]

Congress' view as to the likelihood of recovery from potential defendants in CERCLA liability actions demonstrates the flaw in BFI's position. Assuming *arguendo* that the cost of the clean up could be held to $10 billion, 84% of that cost must be recovered from sources other than the Superfund to complete the job. Also, the legislative history clearly indicates that Congress did not intend for the fund to be depleted, rather that the fund would be maintained as a revolving fund for advancing the costs of these clean up operations while litigation progressed. *See,* Note, 130 U.Pa.L.Rev. at 1232. Regardless, BFI's position requires a finding that Congress believed that most of the clean up costs could be recovered from defendants in CERCLA liability actions.

Neither the legislative history, or the submissions in this case, support that position. The information available in 1980 indicated that many of the potential defendants in these actions were insolvent or judgment proof. *See, e.g.,* Cong.Rec. H 9175 (daily ed. September 19, 1980) (remarks of Rep. Murphy); Note, 130 U.Pa.L.Rev. at 1230. In the filings in this case, the Court has already been advised that a number of the defendants, most notably Mr. Georgeoff, claim to be insolvent. In light of these facts, this Court finds that Congress probably believed that there would be a substantial percentage of judgment proof defendants in these actions. Congress could not have intended to limit the potential defendants while accomplishing its purpose of making the responsible individuals pay for the cost of clean up.

Based on this analysis, the Court concludes that the Congressional intent to

---

**17.** At the time of CERCLA's enactment, some Members of Congress recognized that the $1.6 billion Superfund would not provide sufficient funds to clean up all of the existing dumps. *See* Cong.Rec. H9176 (daily ed. Sept. 19, 1980) (remarks of Rep. Brown); *id.* at S14,967 (daily ed. Nov. 24, 1980) (remarks of Sen. Stafford). This observation does not weaken Ohio and Justice's argument. Even if the Superfund

were inadequate, the legislative history clearly indicates that Congress intended to clean up as many dumps as possible with the Superfund. Given the choice between competing constructions of the statute, this Court will select the construction—in this case holding transporters liable—which will more fully implement the Congressional intent.

make industry pay for the clean up costs must be interpreted as an intent to authorize lawsuits which impose liability retroactively upon transporters.

\* \* \*

█ In light of all these indications of legislative intent, the Court concludes that Ohio has shown sufficient evidence of Congressional intent to make the liability provisions of CERCLA relating to transporters apply retroactively to override the presumption against retroactivity. The legislative intent as discussed above meets the standard of clear and unequivocal statements set out in *Greene.* Accordingly, the Court concludes that the liability provisions of CERCLA may be applied retroactively to transporters.

## II. STATUTORY PRE–REQUISITES TO SUIT.

BFI has also raised a number of more specific statutory challenges to this suit. Specifically, BFI argues that Ohio has failed to comply with the requirements of 42 U.S.C. § 9607(a), the statute providing for actions against private individuals. In relevant part, that statute provides that specified persons shall be liable for—

(A) [A]ll costs of removal or remedial action incurred by ... the state not inconsistent with the national contingency plan; ...

. . . . .

(C) [D]amages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. § 9607(a). First, BFI argues that Ohio has not met its burden of showing actions "not inconsistent with the national contingency plan." Second, BFI argues that a cooperative agreement between Ohio and the federal government is required prior to bringing a lawsuit under this provision. Third, BFI argues that Ohio has not sustained any "costs of removal or remedial action incurred" within the meaning of the statute. Finally, BFI argues that Ohio has not sustained appropriate damages to its "natural resources".

### A. *Consistency with the National Contingency Plan.*

█ The relevant statute, 42 U.S.C. § 9607, provides for the imposition of liability in the amount of "all costs of removal ... not inconsistent with the national contingency plan." In CERCLA's definitional section, the national contingency plan is defined to mean "the national contingency plan published under Section 1321(c) of Title 33 [Clean Water Act] or revised pursuant to § 9605 of this title." 42 U.S.C. § 9601(31). In its briefs, BFI argues that the United States Environmental Protection Agency's failure to publish a revised national contingency plan barred Ohio from meeting its burden of showing consistency with the national contingency plan. Liability, therefore, could not be imposed under this portion of § 9607.

Since the filing of the briefs, a revised National Contingency Plan has been published. *See* 47 Fed.Reg. 55,488 (1982). At oral argument, BFI conceded that its argument with regard to consistency was now moot. The motion to dismiss on these grounds, therefore, is denied.

A number of other issues have arisen regarding the requirement of "not inconsistent with the national contingency plan." The parties apparently differ as to whether Ohio's action must be consistent with the revised national contingency plan promulgated under § 9605 or the national contingency plan developed under the Clean Water Act. Further, differing views have arisen regarding whether consistency is an element of Ohio's cause of action or an affirmative defense. Also, the parties differ as to who bears the burden of proof on the issue of consistency.

The Court, upon consideration, has determined not to rule at this time on any of these questions. While all these points have been briefed and argued to varying degrees, the parties have not had a full opportunity to brief and argue these issues, particularly in light of the newly revised national contingency plan. Accordingly,

this Court will defer decision on these issues.

B. *Requirement of co-operative agreement between federal and state governments.*

BFI next contends that the absence of a cooperative agreement between Ohio and the federal government for clean up of the Dump bars this lawsuit. Under CERCLA, general enforcement authority is placed in the President. The President may, however, "enter into a contract or cooperative agreement with such state or political subdivision to take such actions in accordance with criteria and priorities established pursuant to § 9605(8) of this title and to be reimbursed for the reasonable response costs thereof from the fund." 42 U.S.C. § 9604(d)(1). Absent such a contract or cooperative agreement, the President is barred from providing Superfund monies to the states for response actions. 42 U.S.C. § 9604(c)(3).

 Based on these authorities, BFI urges the Court to imply the requirement of a cooperative agreement as a prerequisite to suit under § 9607. While these sections are designed to work "in tandem", *United States v. Wade,* 12 Env.L.R. 21,051, 21,054 (E.D.Pa.1982), BFI urges a position that these provisions are coterminous. Such a position is not well founded. As noted before, *see* note 14, *supra,* this Court finds no authority for such a position. In fact, the contrary view—that the provisions, though related, are not coterminous—is supported by the fact that § 9607 makes no reference to the provisions of § 9604. This Court concludes that a § 9607 action might be brought where Superfund response authori-

ty does not exist under § 9604. The decision in *United States v. Wade* does not conflict with this result. Accordingly, this Court concludes that Ohio may maintain a lawsuit under § 9607 without first entering into an agreement with the federal government for response costs under § 9604.

C. *Requirement of previous costs incurred.*

BFI's next challenge to Ohio's claim relates to the statutory damages allowed under section 9607(a)(4)(A). That statute provides that defendants shall be liable for "all costs of removal or remedial action *incurred* . . . ." *Id.* (emphasis added). BFI interprets this statute to limit Ohio's recovery to the costs previously incurred in a clean up operation. BFI goes on to argue that the funds committed by a number of generators exceed the costs previously incurred.[18] Arguing that the statute only allows for recovery of costs already incurred and that Ohio has previously recovered more money than it has paid out, BFI argues that there is no basis for recovery under § 9607(a)(4)(A).[19]

 Ohio's complaint refers to Ohio's already incurred response costs in the context of both the amounts previously committed and Ohio's estimated response costs. Ohio urges an interpretation of these allegations that the committed funds are to be applied to the estimated future response costs, not just to the previously incurred costs. On this motion to dismiss, Ohio is entitled to have the allegations of its complaint construed most favorably in its behalf and to receive the benefit of any reasonable factual inferences to be made from these allegations. *See Conley v. Gibson,* 355 U.S. 41,

**18.** At the time of filing, Ohio alleged that it had incurred response costs totaling $825,000. Complaint ¶ 30. The complaint also alleged that generators not involved in this lawsuit had committed $894,500 toward Ohio's response costs. Ohio estimates that its total response cost will exceed $10 million, Complaint ¶ 31.

**19.** Ohio also argues that the statute is ambiguous and urges an interpretation allowing recovery for costs "to be incurred." Ohio's opposition brief at 23. In support of this position, Ohio notes a congressional intent to allow

clean up of waste dumps without costs to the taxpayers. Ohio asserts that BFI's reading would require a state to perform the clean up first, incur the costs of a clean up, and only then attempt to seek reimbursement for the costs. Ohio asserts this view is contrary to public policy of CERCLA and the statute should be interpreted to allow recovery "before the fact." In response, BFI only argues that the clear meaning of the statute is to limit recovery to costs previously incurred.

45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *C. Wright & A. Miller; Federal Practice and Procedure,* Civil § 1357. This Court, therefore, concludes that the previously committed funds should not be applied to reimburse Ohio's previously incurred response costs and that Ohio has sufficiently pled a claim for previously incurred response costs pursuant to § 9607(a)(4)(A).

The decision in *Environmental Defense Fund v. Lamphier,* 12 Env.L.R. 20843 (E.D. Va.1982), does not conflict with this ruling. In *Lamphier,* Virginia sought recovery for its costs incurred in its investigation of the defendants. The *Lamphier* court ruled that these costs were not within the definition of response costs laid out in 42 U.S.C. § 9601(23–25). In this case, Ohio's complaint alleges that it has incurred costs pursuant to these provisions. *Lamphier,* therefore, is inappropriately cited for the view that Ohio has not sufficiently pled previously incurred response costs.

 Alternatively, the Court notes that Ohio's complaint includes a prayer for a declaratory judgment on the issue of the defendants' liability for reasonably incurred costs. Complaint at page 40. Determination as to the availability of declaratory relief is left to the discretion of the Court. *C. Wright, & A. Miller, Federal Practice and Procedure,* Civil § 2759 (2d ed. 1983). In making this determination, this Court must consider whether this case represents "a real controversy between parties having adverse legal interest of such immediacy and reality as to warrant a declaratory judgment." *C. Wright, Federal Courts,* § 100. In this case, the controversy between the parties has advanced to a very "real" level. Ohio alleges that it has already sustained at least $825,000.00 in damages and seeks over $9 million more in damages. Further, the legislative history of CERCLA indicates that Congress intended to encourage states to promptly respond to the threats posed by hazardous waste dump sites. Response actions were not intended to await a determination of liability. In light of these factors, the Court concludes that this is an appropriate case for declaratory judgment on the issue of liability. Accordingly, the Court concludes that Ohio's complaint sufficiently alleges "costs incurred" as required by § 9607(a)(4)(A).

**D.** *Damage to natural resources.*

BFI's final statutory challenge to Ohio's complaint relates to Ohio's claim for damages under 42 U.S.C. § 9607(a)(4)(C). Under that provision, Ohio may recover damages for "injury to . . . natural resources . . . ." *Id.* The statute defines natural resources as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, and appertaining to, [the state.]" 42 U.S.C. § 9601(16). Ohio alleges that the wastes leaking from the Dump are "entering the stream which border the southern and western edges of the Dump, and or the groundwater underlying the Dump." Complaint ¶ 22. No serious challenge can be made to the sufficiency of this allegation. The Court therefore concludes that BFI's motion to dismiss on this basis is not well taken.

### III

Accordingly, the motion to dismiss Counts 1–3 of the complaint is denied.